(31 App. Div. 146.)

MELDON v. DEVLIN et al.

(Supreme Court, Appellate Division, First Department. June 28, 1898.)

1. WILLS—CONSTRUCTION—TRUSTS—"BODY OF ESTATE."
    A testator by his will directed the division of his residuary estate into six parts, and the disposition to be made by his executors of each part. By a codicil he revoked the disposition thus made as to two of these parts, and gave them to two trustees in trust to invest, and, during the joint lives of the trustees and another, to apply so much of the income, and

in such sums, as might seem proper to the trustees, to certain specified persons, "or into the body of my estate." *Held*, in an action involving the construction of the will and codicil, that the term "body of my estate" referred to the general estate represented by the executors, as distinguished from the trust created by the codicil, and that a payment of trust income by the trustees to the executors, and, the specific legacies being then paid, its equal division by the latter among those entitled to receive the four shares of the residuary estate not affected by the codicil, was accordingly authorized.

2. SAME—PERSONS ENTITLED TO TAKE.
Such income as the trustees did not deem it proper to pay to the persons specified in the codicil, they were bound to pay to the executors,—the discretion conferred relating only to a choice between the two alternative classes,—and accordingly all income that was or should have been realized, and was not paid to either class during the existence of the power, belonged in equity ·to the same persons to whom the executors should have paid it if they had received it from the trustees.

3. SAME—INCOME—PERSONS ENTITLED TO NEXT EVENTUAL ESTATE.
The power to dispose of the income ceased upon the death of one of the trustees, and from that date until the death of the other trustee; when the trust ceased, the income, being undisposed of, belonged, under 1 Rev. St. p. 726, § 40; Id. p. 773, § 2,—to "the persons presumptively entitled to the next eventual estate."

4. SAME—NEXT OF KIN.
The codicil conferred upon the surviving trustee the power by will or deed to "appoint the persons, being my relatives, to whom the principal shall belong upon his death." This power he exercised by will. *Held*, that as, in default of an exercise of the power, the court would have executed it in favor of the testator's next of kin, the relatives of the testator who answered that description acquired a vested right in the principal, subject to being diminished or defeated by a different appointment by the surviving trustee, and were accordingly the persons presumptively entitled to the next eventual estate, and so to the undisposed of income, to be taken by them per capita, and not per stirpes.

5. SAME.
The persons who are entitled to undisposed of income, as being presumptively entitled to the next eventual estate, are those who comprise that class, from time to time, as the income accrues.

6. TRUSTS—SALES OF PROPERTY—PRINCIPAL AND INCOME.
If trustees who hold a mortgage foreclose it and buy in the property, and subsequently sell it for less than the principal and interest of the mortgage, the proceeds are to be apportioned between the principal and income of the trust fund in the ratio which the aggregate principal of the mortgage bears to the whole unpaid interest.

7. SAME.
If, upon a sale of land, payment is made partly·in cash and partly in a purchase-money mortgage, both of which, as against the executor of an estate into whose hands the mortgage passes by assignment, represent the principal and interest of a prior mortgage thereon, which was held by a trust estate and was unlawfully discharged without consideration, it is necessary, in determining how much of the purchase-money mortgage represents the arrears of interest on the discharged mortgage, to take the total consideration of the sale (both cash and purchase-money mortgage) into account, and to make the apportionment accordingly.

8. MORTGAGES—ASSIGNMENT—BONA FIDE PURCHASER—IMPUTED NOTICE.
If the trustee of one estate assigns to a third person a mortgage held by him as such, and the assignee assigns it back to him as executor of another estate, and he thereupon abstracts from the latter estate a sum equal to the principal of the mortgage, the latter estate is a bona fide purchaser for value; and no knowledge possessed by the executor, of prior equities, can be imputed to the beneficiaries of the latter estate.

9. TRUSTS—ILLEGAL ACTS OF CO-TRUSTEE—LIABILITY.
    In so far as a co-trustee, though less active in management than his associate, participates in illegal acts resulting in loss to the trust, he and his estate must respond in damages.
    Van Brunt, P. J., and Rumsey, J., dissenting in part.

Appeal from special term, New York county.

Action by Albert Meldon against Angela M. Devlin and others. From an interlocutory judgment, certain of the defendants appealed. Modified.

The action is brought by the plaintiff, as assignee of Jeremiah Doherty, to recover the sum due him out of the estate of Daniel Devlin, deceased. To this end, the surviving executrix of Daniel Devlin, and all persons interested in his estate, are made parties; and a variety of relief is asked, including especially the construction of the fourth clause of the second codicil of said decedent. Daniel Devlin died April 24, 1867; his brother William, July 27, 1892; and his brother Jeremiah, August 11, 1893. By the seventh clause of his will, Daniel Devlin directed that his residuary estate be divided into six equal parts. He provided that the income of one of these parts be applied to the use of his sister, Margaret, during her life, and at her death that the principal be divided among her children. Then follows this provision: "If the said Margaret should leave no children, or issue of children, living at the time of the death, then the said one-sixth part shall fall back into, and become part and parcel of, the residue of my estate." He then provided that the income of another of said parts be applied to the use of his brother Michael and wife during their joint lives and the life of the survivor, and that upon the death of the latter the principal be paid to his niece Sarah O'Connor. Then follows this provision: ."And, in case she be dead at the time of the death of the said Michael and his wife, then to the children of the said Sarah who may then be living, share and share alike; and in case there be no child or children of the said Sarah living at the death of my said brother Michael and his wife, and the said Sarah then be dead, the said last-mentioned one-sixth part shall fall back into, and become part and parcel of, the residue of my estate." One of said parts he gave absolutely to each of his brothers William and Jeremiah. The remaining four-twelfths he disposed of in favor of his nephews Jeremiah and James Crolly and Benedict and Foster J. Devlin, their widows and issue. This latter provision was entirely revoked by the fourth clause of his second codicil. That fourth clause reads as follows: "I hereby revoke all the provisions of my said last will and testament in favor of my nephews Jeremiah Crolly, James Crolly, Benedict Devlin, and Foster J. Devlin, their respective widows and issues. The portion of the rest, residue, and remainder of my estate in and by said last will and testament given, devised, and bequeathed unto the said Jeremiah Crolly, James Crolly, Benedict Devlin, and Foster J. Devlin I give, devise, and bequeath unto my brothers Jeremiah and William, in trust, nevertheless, to invest the same as aforesaid, and to apply so much, if any, of the income and dividends therefrom from time to time, and in such sums as may seem proper to them, to the use of the said Jeremiah Crolly, James Crolly, Benedict Devlin, and Foster J. Devlin, respectively, or their respective widows and issue, or to pay such income, or such part as they may see fit, into the body of my estate, during the joint lives of my said wife, brothers Jeremiah and William, with power and authority to the survivor of the said trustees by will or deed to appoint the persons, being my relatives, to whom the principal thus invested shall belong on the death of the survivor of said trustees, and in what proportions, and with the further power to said trustees, and the survivor of them, to pay over to any of my said nephews or their issue at any time out of the principal so invested an amount not exceeding one-twelfth part of the said rest, residue, and remainder of my estate, with the further power to pay over, in their discretion, any part of the amount so invested to the heirs, or any of them, of my cousin John Devlin, deceased, to my cousin Eliza McGavagan and her heirs, and to my cousin James Devlin and his heirs." The trustees received from the executors over $281,000 for the purpose of the trust, almost all of which was paid to them in 1872. The testator directed

his executors "to invest the moneys of my estate in public stocks of the United States or of the state of New York, and not otherwise"; and this direction was made binding upon the trustees by the fourth clause of the codicil. In violation of it, the latter made large loans out of the trust estate to the firm of Devlin & Co., of which Jeremiah Devlin was a member. On December 31, 1883, the amount due by that firm to the trustees was $154,-297.85. For this were thereafter substituted bonds and mortgages executed by Jeremiah Devlin and his wife, Angela M. Devlin, upon real estate which they owned. After William Devlin's death, on July 27, 1892, Jeremiah Devlin became his executor. On this date the trustees held twelve mortgages, aggregating $171,300, upon land of Jeremiah Devlin and his wife, the interest upon which was greatly in arrear. In September, 1892, and March, 1893, these mortgages were assigned by Jeremiah, as surviving trustee, without consideration, to the defendant·Jeremiah C. McAndrew. The latter is a son of Ellen McGavagan, the cousin of Daniel Devlin mentioned in the fourth clause of the codicil. He satisfied ten of the mortgages, and reassigned two of them to Jeremiah Devlin, as executor of William Devlin, who thereupon withdrew from the assets of William Devlin's estate an amount equal to the principal of the mortgages. By a codicil of his will, executed in 1892, Jeremiah Devlin appointed his nine children as the persons who should take the principal of the trust fund. The trustees also held three mortgages, aggregating over $29,000, executed by one Phillips, on which interest was not collected after September, 1875. They foreclosed these mortgages, and bought in the property, which they held at the date of William Devlin's death. At this date there was a surplus of $11,179.79, unexpended income. Between November, 1878, and May, 1888, the trustees paid over to the executors of Daniel Devlin $101,000 of the income of the trust fund. This the latter distributed among those persons who took the four-eighths of the residuary estate not included within the trust, in the proportions in which they took such four-eighths, viz.: To William Devlin, one-fourth; to Jeremiah Devlin, one-fourth; to Sarah D. O'Connor, one-fourth; to Mary J. Meldon and her representatives, one-eighth; and to Jeremiah Doherty, one-eighth. They failed, however, to pay Jeremiah Doherty his full share, as thus computed, by $11,944.95, which sum was converted by Jeremiah Devlin to his own use.

The judgment decreed that it was the duty of the trustees to pay the income of the trust fund accruing prior to July 27, 1892, and not applied to the use of the persons specified in the fourth clause of the codicil, to the executors of Daniel Devlin; that said income thereupon became part of the residuary estate, but that none of it was to be added to the principal of the trust fund; that the persons entitled to it between December, 1878, and July 27, 1892, were those among whom the executors divided the $101,000; and that the respective rights to the income accruing between July 27, 1892, and August 11, 1893, were the same, except that the children of William Devlin succeeded to his interest, the plaintiff to Jeremiah Doherty's, and the executors of Jeremiah Devlin to the one-fourth interest which he owned during life. The plaintiff's right to the $11,944.95 not paid to Jeremiah Doherty is established, and prior payment of it decreed out of any funds in the hands of Bridget Devlin, surviving executrix of Daniel Devlin, and out of the moneys adjudged to be payable into the body of Daniel Devlin's estate. Said executrix and the executors of Jeremiah Devlin are ordered to account. Further facts are stated in the opinion.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, McLAUGHLIN, and INGRAHAM, JJ.

Walter S. Logan, for appellants Mary E. J. Devlin and others.

Merritt E. Haviland, for appellants Angela M. Devlin and others.

S. Hanford, for appellant J. Numa Roussel, ancillary executor of William Devlin.

Edward Sidney Rawson, guardian ad litem of Alice S. Devlin and other appellants.

Rudolf Dulon, for plaintiff respondent.

Louis O. Van·Doren, for respondent Peter W. Felix.

BARRETT, J.   Certain considerations concerning the trust cre-
ated by the fourth clause of the codicil of Daniel Devlin are practically
undisputed, and may be stated at the outset, to simplify the discus-
sion.   The trust was legal in its duration.   It was to last only dur-
ing the lives of William and Jeremiah Devlin.   The power of disposi-
tion of the income does not enlarge the trust term.   This power of
disposition existed only during the joint lives of William and Jere-
miah, and the testator's widow, Bridget Devlin.   Hence as soon as
either of the brothers died this latter power ceased, and when the
death of the other followed the trust terminated.   The phrase, "dur-
ing the joint lives of my said wife, brothers Jeremiah and William,"
qualifies each of the preceding clauses, limiting the power to pay to
the beneficiaries, as well as into the body of the estate.   This is the
natural construction.   Otherwise we should have two powers,—one
carefully limited as to time, and the other left wholly indefinite in this
respect.   There is apparently no reason for any such distinction.
That it was not intended is shown by the wording of this part of the
clause, and of that which follows.   The power to dispose of the in-
come is given to the trustees jointly, to be exercised to such extent
"as may seem proper to them."   It was a discretionary power, and
the testator evidently meant to secure the exercise of the judgment
of both his trustees.   When he intended that one of them alone
might act, he expressly so stated.   The latter part of the clause con-
tains two distinct powers with reference to the principal of the fund,
one of which is conferred upon "the survivor of said trustees," and
the other upon "said trustees and the survivor of them."

The first serious question relates to the proper disposition of the in-
come of the trust fund, namely, the $101,000 paid by the trustees to
the executors prior to May, 1888.   This disposition was evidently
made in execution of the power to pay income "into the body of my
estate."   There is a dispute as to the meaning of these words; it
being claimed on the one hand that the money was properly paid to
the executors, and on the other that the testator meant it to be added
to the principal of the trust fund.   We think the first contention is
clearly right.   The executors, as the decedent's legal representa-
tives, stood for the "body of the estate."   The distinction in the
testator's mind was between the special trust fund, on the one hand,
and the general "body of the estate," on the other.   The trust was
not the general body of the estate, but a particular fund carved out
of it.   The words used are quite inapt to express an intention that
the money should go to increase the principal of the trust fund.   The
trustees are directed to "pay such income   *   *   *   into the body
of my estate."   They are to dispose of it by payment, not to retain it.
The testator surely did not mean to indicate a payment by the trustees
to themselves in the very same capacity in which they held the money.
The proper disposition of the money by the executors also seems clear.
They were to apply it in fulfillment of the purposes of their trust.
The specific legacies had all been paid, and the money consequently
went to the residuary legatees.   But it did not form part of the
residuary estate, as that was at first constituted.   If so, two-sixths
of it would again find its way into the trust, from which it had just

been sent. This would evidently have been contrary to the testator's intention. In such a case it would be the duty of the trustees to again pay this portion of the income to the executors, part of it would again come to them, and this process of payment and repayment would continue indefinitely. What the testator meant was that the money should form a portion of that part of his residuary estate not included within the trust. The residuary estate, as at first constituted, was composed of two parts,—the trust fund, and the remainder; and this remainder the testator calls the "body of my estate." This construction not only, as we think, gives to the testator's words their natural significance, but also prevents, either in whole or in part, an illegal accumulation of the income of the trust fund. The rule that the residue of a residue does not pass to the residuary legatees, but devolves as undisposed of, has no application. That rule applies only where the provision has lapsed. In such a case it does not go to the other residuary legatees, as the testator has already indicated the extent to which he means them to share in the residuary estate. The income in question has not lapsed. The testator has directed what shall become of it in case the trustees do not transfer it to the beneficiaries, and his direction must be carried out.

It has been argued that there was no general "body of the estate" in the hands of the executors at the time when the trustees were directed to make this payment. This argument rests upon the theory that the executors had already divided the residue of the estate into six equal parts, as provided by the will, and that the testator meant the residuary beneficiaries to take these shares as thus constituted,— no more and no less. It is true that he did direct the executors to make the division and distribute the shares; but no reason is apparent why he should not, by subsequent words, qualify these provisions by increasing the first four shares. It does not appear that the testator meant this initial division to be final and absolute. There is nothing so unusual about a subsequent increase of the shares as to justify putting a forced and unnatural construction upon the words "body of my estate." Furthermore, it is clear from the will that the testator contemplated, when this was made, at least, that the amount of the first four shares of the residuary estate might be increased; for he directed that, in certain contingencies, one-half of the remaining two-sixths should "fall back, and become part and parcel of the residue of my estate." Thus, as to Jeremiah Crolly, he provides in the eleventh clause of his will as follows:

"But, in case my said nephew Jeremiah should die without having become entitled as aforesaid to the payment or transfer to him of said one undivided twelfth part, then upon his death I direct the same to be transferred to his children then living, and to the issue of such as may be dead, per stirpes, and not per capita; and in case he should leave no children, or issue thereof, then the same shall fall back, and become part and parcel of the residue of my estate."

So, as to James Crolly we find the following provision in the twelfth clause:

"But in case of my said nephew James should die without having become entitled as aforesaid to the payment or transfer of said one undivided twelfth part, then upon his death I direct the same to be transferred to his children

53 N.Y.S.—12

then living, and the issue of such as may be dead, per stirpes, and not per capita; and in case he should leave no children, or issue thereof, then the same shall fall back into, and become part and parcel of, the residue of my estate."

And, as we have seen in the statement of facts, he made a similar direction, in certain contingencies, with regard to two of the four-sixths disposed of in the seventh, eighth, ninth, and tenth clauses. Hence any argument based upon the theory that the testator did not mean to increase the shares of the residuary estate as at first constituted falls to the ground. Stress is laid upon the fact that the words "residuary estate" are used in the will, and "body of my estate" in the codicil. But in truth this fact bears in the plaintiff's favor. The testator did not mean that the income should go into the general residuary estate, and be distributed accordingly, but that it should form part of the residuary estate not included within the trust fund. Thus, the court below rightly decreed that Jeremiah Doherty was, and the plaintiff is, entitled to the unpaid balance of the $101,000 paid over by the trustees to the executors. Prior payment of this sum was properly decreed out of any funds in the hands of Daniel Devlin's executrix, or which are payable to her under the terms of the judgment. No accounting was necessary as a preliminary to this decree. There are no creditors of the Daniel Devlin estate; and the rights of creditors of Jeremiah Devlin's estate are fully protected by the judgment, which directs an accounting, payment to a receiver of such part of the debt of that estate as it may be able to pay, and distribution by the receiver in accordance with the judgment.

The next question relates to that portion of the income which the trustees did not pay either to the executors or to the beneficiaries named in the fourth clause of the codicil. It is urged that payment by the trustees to the executors was at least discretionary, and cannot be enforced. We think not. The clause provides that the trustees shall "apply so much, if any, of the income and dividends * * * from time to time, and in such sums as may seem proper to them, to [the beneficiaries], * * * or to pay such income, or such part as they may see fit, into the body of my estate," etc. There was clearly a discretion vested in the trustees as to the amount to be received by the beneficiaries named. We think, however, that there was no additional discretion to withhold from the estate what was not thus paid. Words indicating discretion are coupled with the provision in favor of the executors, but this discretion was not an additional one, but an alternative for the other. The trustees were at liberty to pay either to the beneficiaries or to the executors, as they should think best, but what they did not pay to the former they were bound to pay to the latter. The discretionary language used in the second alternative is but the complement to that used in the first. In other words, the entire income was to be disposed of in one way or the other, or in both ways. None of it was to remain unapplied. Upon the other construction, there would be not only an illegal accumulation, but an accumulation for no purpose whatever. Clearly, the testator did not mean the income to lie idle in the hands of the trustees while this power lasted. It follows that the actual transfer by the trustees to

the executors is unimportant.    There was an imperative power in trust, and the beneficiaries take in the same manner as though it had been executed.    Smith v. Floyd, 140 N. Y. 337, 35 N. E. 606.    Consequently all income received by the trustees prior to July 27, 1892, and not paid to the beneficiaries, belongs in equity to those persons among whom the executors should have distributed it had it been so paid.    The same rule applies to income which should have been, although it was not, realized out of the trust estate, and for which, in consequence, the trustees, or either of them, were liable.    This income was not paid to the beneficiaries named in the codicil, and all such income belongs to the persons specified.

We thus agree with the learned court below as to the disposition of the income accruing up to July 27, 1892, the date of William Devlin's death.    We have reached a different conclusion, however, with reference to that accruing between this date and August 11, 1893, when Jeremiah Devlin died.    On July 27, 1892, the power to dispose of the income of the trust fund ceased.    After that date neither the beneficiaries nor the executors were entitled to any of it, and it remained undisposed of.    It consequently belonged, under the statute (1 Rev. St. p. 726, § 40; Id. p. 773, § 2), "to the persons presumptively entitled to the next eventual estate."    We cannot agree with the learned counsel for the plaintiff that these persons were the residuary legatees. The persons who take are those presumptively entitled at the time the income accrues, although the estate eventually goes elsewhere. Kilpatrick v. Johnson, 15 N. Y. 322, 326, 327; Schettler v. Smith, 41 N. Y. 328.    Who were presumptively entitled to the principal of the trust fund between July 27, 1893, and August 11, 1893?    During this period Jeremiah Devlin was vested with a power to dispose of the principal of the trust fund among such "relatives" of Daniel Devlin as he should see fit.    Until the end of the period, it could not be told with certainty who those persons would be, since he made the appointment by a will which took effect only upon his death.    We think, however, that these interests vested, under the power, before his death.    It is settled that where a power of appointment is conferred, and the property to be disposed of, and its recipients, are both certain, the latter obtain vested rights which cannot be destroyed by the nonaction of the donee of the power.    Dominick v. Sayre, 3 Sandf. 555; Smith v. Floyd, supra.    This rule has often been applied by the English courts where there is a power to appoint among "relations,"—a word which is analogous to that used in the case at bar.    In such cases it is impracticable to appoint among all the relations, and the court confines itself to those persons who come within the description of next of kin.    Harding v. Glyn, 1 Atk. 468; Birch v. Wade, 3 Ves. & B. 198; Cole v. Wade, 16 Ves. 27.    But it is held, not that the property passes under the statute of distributions, but that the court executes the power in the manner specified.    As was said in Harding v. Glyn, the donee's failure to appoint "shall not make the devise void, but the power shall devolve on the court, and, though this is not to pass by virtue of the statute of distributions, yet that is a good rule for the court to go by"; and the later cases adhere to this theory. We think this rule must be deemed to have been adopted in this state.

In Dominick v. Sayre, supra, Judge Duer referred with approval to the English cases, but declined to apply the rule to the case of an appointment among the testator's family; holding that this meant his own immediate family, as to which there was no uncertainty. In this he deviated from the English rule, which does not make the distinction. Cruwys v. Colman, 9 Ves. 319; 14 Ves. 607. But, so far as the rule applies to a power to appoint among "relations," it was fully approved. The rule was also recognized in Gallagher v. Crooks, 132 N. Y. 338, 343, 30 N. E. 746, 747, where the cases were cited, and the court said, "It is well settled that the word [relations], when used in wills relating to personalty, only embraces persons within the statute of distributions." It follows that those relatives of Daniel Devlin comprised within the class of his next of kin obtained a vested interest in the principal of the trust fund, under the power in the fourth clause of his codicil, subject only to be diminished or defeated by a different appointment by Jeremiah Devlin. Consequently these relatives were entitled to the next eventual estate, and the undisposed of income belongs to them. They take per capita, not per stirpes. Dominick v. Sayre, 3 Sandf. 571. And those who comprise the class at the time the income accrues are entitled to it. Kilpatrick v. Johnson, 15 N. Y. 326, 327. In this case the income which was illegally accumulated was given to the children of certain of the testator's daughters upon the death of the latter. Denio, J., said:

"I am of opinion that they take the whole interest upon their shares during the time they continue to be thus presumptively entitled. As to the children born subsequent to the testator's death, and those yet to be born, they are to come in and share in the income which may accrue after they become presumptively entitled to a share of the next eventual estate in the principal of the fund."

We think the court below rightly disposed of the proceeds of the sale of the water lots. These were two lots upon which the trustees originally held two of the Phillips mortgages, aggregating about $25,000. In 1885 the mortgages were foreclosed, and the trustees bought in the property. In 1893 Jeremiah Devlin, as surviving trustee, sold it to the defendant Felix for a sum less than the principal and interest of the original mortgages. The judgment directs that the proceeds of sale be apportioned between the principal and income of the trust fund in the ratio which the aggregate principal of the mortgages bears to the whole unpaid interest. This was correct. The land represented the original investment in the mortgages, and its proceeds should be distributed in the same manner as though the mortgages were being foreclosed for the first time for the amount of the purchase price. It is well settled that where the interest upon mortgages is unpaid, and the premises are eventually sold, the sum received should be ratably apportioned between principal and income. 2 Lewin, Trusts (Am. Ed. 1889) p. 1228; In re Moore, 54 Law J. Ch. 432; Hagan v. Platt, 48 N. J. Eq. 206, 21 Atl. 860. This is not a case of devastavit, and cases like Cook v. Lowrey, 95 N. Y. 103, have no application.

The next questions relate to the rights of the William Devlin estate with regard to certain mortgages assigned to Jeremiah Devlin, as its

executor. The O'Connor mortgage, for $7,560, may be first considered. This was executed by Thomas H. O'Connor in 1872, and became part of the trust fund in 1886. In 1893 Jeremiah Devlin, as surviving trustee of Daniel Devlin, assigned it to McAndrew. He reassigned it to Jeremiah, as executor of William Devlin, who thereupon abstracted from the assets of William Devlin's estate a sum equal to the principal of the mortgage. At the time of such assignment, interest was due from March, 1887. Subsequently to 1872, Angela M. Devlin, wife of Jeremiah (who had become the owner of the property), executed, with her husband, two other mortgages thereupon, which were acquired by the trustees, and were in 1893 assigned by Jeremiah Devlin, as surviving trustee, to McAndrew, and by him satisfied. At the time McAndrew executed such assignment and satisfactions the interest on the mortgages was largely in arrears. The court has held that McAndrew did not acquire, by the assignments to him, any title to the unpaid interest on these mortgages, and that such interest remains a lien upon the premises superior to the lien of the O'Connor mortgage held by the William Devlin estate. That estate, on the other hand, claims to be a bona fide purchaser of the O'Connor mortgage, for value, and to have a first lien upon the premises. Jeremiah Devlin, as surviving trustee, could not convey the interest to McAndrew in execution of the power contained in the fourth clause of the codicil. But he had the same power to sell this mortgage as to deal with any of the other assets of the estate, and any one purchasing for value from McAndrew, without knowledge of the facts, would get good title. The William Devlin estate claims to be such a purchaser, and we are inclined to think that the contention is well founded. It undoubtedly paid value; for Jeremiah Devlin, as its executor, withdrew the amount of the purchase price from the funds of the estate. It is difficult to see how any knowledge is imputable to the estate which will impeach its title. Jeremiah Devlin could not, individually, have obtained title to the unpaid interest; but he was acting as executor, and we do not think that his knowledge was imputable to the beneficiaries of the William Devlin estate. He was not the agent either of William Devlin or the beneficiaries, but took the property as owner, liable to account as such to those ultimately entitled. Schmittler v. Simon, 101 N. Y. 557, 5 N. E. 452; Ferrin v. Myrick, 41 N. Y. 319. We think the case is the same in principle as though Jeremiah Devlin had taken the mortgage individually, and, by an instrument inter vivos, transferred it to the beneficiaries for the sum which he withdrew from the assets of the estate. In such a case the latter, if they took in good faith, would certainly acquire a perfect title. In somewhat analogous cases, where a trustee of two different funds unlawfully transferred moneys of one to the other to supply a deficiency, it has been held that the cestuis que trustent of the latter fund, having the legal title and an equally good equity, are entitled to retain it. Thorndike v. Hunt, 28 Law J. Ch. 417; Taylor v. Blakelock, 32 Ch. Div. 560. The knowledge of the trustee is not imputed to the beneficiary in such a case. We think the present one is even stronger in favor of the purchaser. It should consequently have been decreed that the estate of William Devlin

has a first lien upon the premises to the full extent of the mortgage for $7,560.

The same considerations apply to the Ridgeway mortgage, for $4,000. The property which it covered was originally owned by Phillips, who mortgaged it to the Daniel Devlin executors. The trustees acquired this mortgage, foreclosed it, and bought in the property. Jeremiah Devlin, as surviving trustee, conveyed it to Ridgeway, taking back a purchase-money mortgage,—the one in question. This is assigned to McAndrew in 1893, who reassigned it to him as executor of William Devlin. For the reasons stated the William Devlin estate should be held to have good title to this mortgage, to its full extent.

The ruling with reference to the two Shaw mortgages is also assailed. The premises which they cover were originally owned by O'Connor, who mortgaged them in 1872 to Daniel Devlin's executors for $6,720. This mortgage became part of the trust fund in 1886. After its execution, Angela M. Devlin became the owner of the property; and she and her husband, Jeremiah, executed two mortgages thereon for $3,300 and $2,500, which were subsequently acquired by the trustees. In 1893 Jeremiah Devlin, as surviving trustee, assigned all three mortgages to McAndrew. The latter satisfied the two mortgages executed by Mr. and Mrs. Devlin, and reassigned the other to Jeremiah Devlin, as executor of William Devlin, who thereupon satisfied it. At the time McAndrew executed the assignment and the satisfactions, the interest on the mortgages was largely in arrear. The title thus being clear, Mrs. Devlin conveyed the premises to Shaw, taking back two purchase-money mortgages for $4,000 each. The court has decreed that these mortgages represent the unpaid interest on the three original ones, and that such interest must first be paid out of their proceeds. This case differs from the previous ones. The William Devlin estate may have originally obtained good title to the O'Connor mortgage for $6,720, but all such rights were destroyed when Jeremiah Devlin, as executor, satisfied it. It may be that, if this mortgage was satisfied without consideration, the William Devlin estate would be entitled to have it reinstated, as against the recipients of the income of Daniel Devlin's estate, who are before the court, and would be bound by the judgment. But no such claim is made or issue tendered in the answer of the ancillary executor of William Devlin. On the contrary, it is there distinctly alleged that the satisfaction of this mortgage "was based upon a full and valid consideration proceeding from the estate of said William Devlin, and was proper in all other respects." The language is somewhat peculiar, but the intention not to assail the instrument is made clear. Instead of a demand being made for the cancellation of the satisfaction, any such intention is explicitly disclaimed. The natural inference from such a pleading is that the mortgage was paid in full to the estate of William Devlin. The real contest is between the beneficiaries of the income, on the one hand, and Angela M. Devlin, on the other. She is in no position to urge that the lien of the unpaid interest was removed by the transfers to, and instruments executed by, McAndrew. It is found, and is not disputed, that the assignments and satisfactions executed by McAndrew were without consideration. Mrs. Devlin

consequently paid nothing for the satisfaction of these mortgages upon her land, and hence took them subject to all equitable rights of the recipients of the income of Daniel Devlin's estate.    We think, however, that the provisions of the judgment in this regard should be modified.    The purchase price of premises represented both the interest and principal of the original mortgages,—the one as much as the other.    It was consequently erroneous to order prior payment of the interest.    There should have been an apportionment between principal and interest, as in the case of the water lots.    And it was the whole purchase price received by Mrs. Devlin, and not merely the mortgages, which thus stood for principal and interest.    The amount thus received should be ratably apportioned between the principal and unpaid interest of the old mortgages.    The amount due to interest should be thus determined, and deducted out of the proceeds of the purchase-money mortgages.

The principal remaining question relates to the correctness of the ruling that William Devlin's estate is not liable for the mismanagement of the trust fund.    We are unable to agree with the learned court below upon this point.    The rule regarding the liability of executors and administrators, which is also applicable to trustees (Ormiston v. Olcott, 84 N. Y. 339), was thus stated in Nanz v. Oakley, 120 N. Y. 84, 89, 24 N. E. 306, 307:

"One joint executor or administrator is not liable for the assets which come into the hands of the other, nor for the laches, waste, devastavit, or mismanagement of his co-executor, unless he consents to or joins in an act resulting in loss to the estate, in which event he will become liable.   In other words, co-executors and co-administrators may act either separately or in conjunction.   They are jointly responsible for joint acts, and each is separately answerable for his separate acts and defaults."

Plainly, William Devlin and his estate cannot be absolved under such a rule.    One fact alone would preclude such a result: It appears, and the court has found, that the original loan to Devlin & Co. was made with his knowledge. . If he had this knowledge, he could certainly have prevented the loan, and is just as much liable for consenting to it as though he had been active in procuring it.    And this loan was the principal breach of trust, which caused most, if not all, of the subsequent questionable transactions.    It also appears that William Devlin participated to a very considerable extent in the business of the trust; having access to and examining its books, and taking part in interviews where its affairs were under discussion.    Among other things, he became indorser upon the notes which Devlin & Co. originally gave for the moneys loaned it, and later took from Jeremiah Devlin a power of attorney of the mortgaged land for the protection of the trust.    It also appears that the property was in the joint control of the two trustees, that all proceedings were taken in their joint names, and that William Devlin received his commissions as trustee.    The evidence, in short, shows that, although Jeremiah was the more active of the trustees, yet much of the business was being carried on by them jointly.    In so far as William Devlin participated in illegal acts from which loss resulted to the trust, his estate must respond in damages; and the judgment should have so provided, instead of absolving his estate from all liability.    The details will be

largely a matter to be adjusted on the accounting, in accordance with the principle laid down. The cases cited in opposition to this conclusion (Ormiston v. Olcott and Nanz v. Oakley, supra) differ very materially in their facts, as the trustee in those cases did not receive any of the trust estate, and held quite aloof from its affairs.

We think the judgment should be modified by striking out the provision requiring the executors of Jeremiah Devlin to pay into court the amount of the preliminary deposit made by Felix on the purchase of the water lots. No reason appears why this claim stands on a different footing from any other debt due by the estate, or should, in case of insolvency, receive a preference. The judgment contains proper general provisions for the liquidation of the debt of the estate of Jeremiah Develin, and no exception should be made with regard to this item. We also think the judgment should not have decreed the liability of Jeremiah Devlin's estate for his failure to collect interest on the Phillips mortgages. Whether this interest, or all of it, was collectible, or whether it was prudent and justifiable for the trustees to withhold foreclosure as long as they did, were proper questions for the accounting. We have examined all the other points raised, but do not think the judgment requires correction in any of the particulars specified.

The judgment should be modified as indicated in this opinion, and as so modified affirmed, without costs of this appeal to either party. All concur, except VAN BRUNT, P. J., and RUMSEY, J., dissenting in part.

RUMSEY, J. I concur with Mr. Justice BARRETT that, by the terms of the fourth clause of the second codicil, it was the duty of the trustees to pay over all the income which they had not appropriated to the beneficiaries under the trust created by that codicil to the body of the estate; and I agree with him that the direction thus to pay it over required that it should be paid to the executors under the will. But I do not agree with the conclusion which he reached, that this fund thus paid to the executors became again a portion of the residuary estate from which it had been originally taken, and should be divided among the residuary legatees, other than the trustees, to whom two-sixths of the estate was given by the fourth clause of the second codicil. The testator gave several very large legacies by his will. After those were paid, there was left a considerable residue of his estate. This he undertook to dispose of by the seventh clause of his will, which commences, "All the rest, residue, and remainder of my estate, both real and personal, I direct to be divided into six equal parts." There is no provision anywhere in the will for a division of the residuary estate, or any portion of it, into less than six parts. Whatever the executors had as residuum was to be divided into six parts, by the express terms of the will; and they had no more right to divide it into four parts, and give it to four persons among the residuary legatees, than they had to refuse to divide it at all. It made no difference, clearly, for the purposes of the will, as to funds to which they were originally entitled, whether they were divided all at one time, or from time to time as they came into the possession of

the executors. In either case, if they constituted a portion of the residuary estate, the testator positively directed what should be done with them; and that was to divide them into six parts, and to dispose of the parts as he directed in his will. It is very true that the presumption is that he did not intend to die intestate as to any portion of his estate, and such is the presumption in every case where a testator disposes by a residuary clause of all property not otherwise disposed of. When that residuary clause had been carried into effect by the division of the estate included in it, into six parts, two of which were held in trust under the fourth subdivision of the second codicil, they were disposed of. They went out of the hands of the executors. The residuary estate had been ascertained, and the amount of each share taken away from the executors, and vested in those persons to whom the will gave it, so that the executors had no further concern with it. They performed their duty just as the will directed them to do. The testator probably had no idea that any of the income of the trust estate for the benefit of his nephews would come back into the hands of the executors. If he had, it is quite probable that he would have taken steps to dispose of it; but the will will be searched in vain for any direction by which the executors have any power to dispose of that income as such, or any right to dispose of it except as a portion of the residuary estate; and that had ceased to exist, and been disposed of, before this fund came into existence. It was clearly, therefore, a portion of the estate which was not disposed of by the will, and as such, in my judgment is devolved upon the next of kin of the testator, as not disposed of. Beekman v. Bonsor, 23 N. Y. 298, 312. I can find nothing to take this fund out of the general rule. The fact that in a certain contingency the bequests of two separate shares of the residue might fall, and that the testator, in view of that possibility, directed that they should fall back into, and become a part and parcel of, the residue of his estate, without in terms giving them to the other persons who by the will were to share in the residue in fixed proportions, does not, in my judgment, affect the construction of the will as to the matter now under discussion. It is unnecessary to consider here what would become of either of these shares in case the gift by the executor failed; but I am quite clear that those shares would be undisposed of, and would go to the next of kin, because it cannot be deemed that the testator intended, after having disposed of the rest, residue, and remainder of his estate, by dividing it into shares, and specifically designating the person who should take each share, to give to that person as a portion of the same residue, by the same devise, something in addition to what the clause had already given him. If he had intended that the gift of these two shares, having failed, should go to the other persons entitled to a fixed portion of the residuary estate, he undoubtedly would have said so. The fact is that the provision in the seventh clause, dividing the residue of the estate into six equal parts, and giving directions as to each one of those parts, is not in any sense a residuary clause, the object of which is to take everything which the testator has not already disposed of, and give it to some one finally. The property given by this clause is not finally disposed of, but both in the seventh and eighth clauses of

the will, and in the fourth clause of the second codicil, which disposes of two shares of this so-called residuary estate, the testator has made it possible that the gifts should lapse, and he has taken no' steps to provide for them afterwards. The income which accrued before the 27th day of July, 1892, is clearly in that situation, and therefore belongs to the next of kin of the testator. In all other respects than this, I concur with the judgment of Mr. Justice BARRETT.

VAN BRUNT, P. J., concurs.