(Surrogate's Court, Westchester County. March, 1904.)

1. TESTAMENTARY TRUSTS—CAPITAL AND INCOME—APPORTIONMENT.
   Where trustees under a will invested part of the residuary estate in mortgages on unimproved property, and, on default in payment, bought in the property to protect the estate, and carried it for many years, paying costs of foreclosure, taxes, and assessments out of the principal, and then sold at a profit, the proceeds of sale should be apportioned, as between the remaindermen and life beneficiaries, according to the ratio which the entire principal put into the property bears to the income invested therein.

2. SAME—ESTOPPEL.
   The fact that by former accountings and decrees the expense of carrying the foreclosed property had been charged to principal does not estop the life beneficiaries from claiming that a part of the proceeds of a sale belongs to income.

Proceedings upon the judicial settlement of the account of Stephen D. Marshall and another as trustees under the will of Levin R. Marshall, deceased. Objections to account.

Peckham, Miller & King, for trustees.
Strong & Cadwalader, for respondent Dunbar Marshall.
Marshall, Moran & Williams, for respondents Stephen D. Marshall, Josephine E. Ogden, Elizabeth M. Marshall, Sarah E. Mordaunt, and William St. J. E. Marshall.
Steele, De Friese & Frothingham, for contestants George M. Marshall and Ann H. Gaither.
James F. Horan, special guardian, contestant.

SILKMAN, S. The testator died in July, 1870, leaving an estate of about $500,000, consisting of both real and personal property, and leaving a will by which the residuary estate was given and devised in the following language:

"All the rest, residue and remainder of my said estate, of every nature and kind wheresoever situate, I give, devise and bequeath to my executors hereinafter named, or to such of them as shall qualify and assume the execution of this my will, their successor or successors, upon the following trusts, that is to say, upon the trust, out of the income of my said estate to pay, during the lifetime of my said wife, the sum of two thousand dollars ($2,000) per annum, by equal semiannual payments (the first payment to be at the end of six months from my decease), to each of my six children, George M. Marshall, Josephine E. Ogden, William St. John Elliott Marshall, Mary D. Marshall, John N. Marshall and Stephen Duncan Marshall, or to the child or children of any of my said children who may die during my lifetime or the lifetime of my said wife, such child or children of such deceased child of mine taking the said two thousand dollars per annum in place of its or their parent, per stirpes and not per capita.

"And upon the further trust to pay all the balance and remainder of the income of my estate to my said wife annually during her life.

"And upon the further trust, after the death of my said wife, to reduce my estate into money or interest-bearing securities, and thereupon to divide and set apart the same into as many equal parts as I shall then have of my above children, or the lawful issue of any deceased child living (the issue of any deceased child, if more than one, to count as one in making such division), and to pay over the income of one of such equal parts to each of my said children, or to its or their lawful issue as aforesaid, during the lifetime of the youngest of my said children who shall be living at the time of my decease, or the decease of my said wife, if she survive me; and after the death of the said the youngest of my said children who may be living at the time of my decease, or the decease of my said wife, if she survive me; upon the further trust, to divide and distribute my said estate equally between my said children and the lawful issue of any deceased child who may have died leaving such issue, per stirpes and not per capita; but from the share set apart for my son George M. Marshall there shall be deducted and divided between his brothers and sisters, or their issue, as aforesaid, the sum of twenty-five thousand dollars, because of the large advances I have already made to him."

Testator's widow died in February, 1895. The respondent Stephen D. Marshall was testator's youngest child, and upon his life depends the continuing of the trust.

The only question raised by the objections to the account is as to the proper treatment to be made, as between the life beneficiaries and remaindermen, of the proceeds of certain real estate which had been taken in under foreclosure.

The facts are these: In June, 1872, the executors invested $15,000 of the residuary estate upon the bond of one Willis, secured by a mortgage on unimproved real property at 6th avenue and 140th street, New York City, interest upon which was paid to June 1, 1878, when default was made. The executors subsequently foreclosed, and in December, 1879, took title to the property, which they carried until May, 1903, and then sold for the net sum of $54,500. The costs of foreclosure, the carrying charges, including taxes and assessments and the other expenses incident thereto, amounting in all to $16,174.-33, were paid out of principal. Adding to this amount the original

amount of the mortgage, we have a total investment of principal in
the property of $31,174.33. The income invested in the property is
the interest which would accrue, subsequent to June 1, 1878, upon the
principal locked up in the property; that is, the original amount of
the mortgage, and the various amounts of principal paid out for taxes,
assessments, etc., from time to time. The item of taxes amounts to
the sum of $8,872.45. The executors also invested part of the resid-
uary estate in a bond of one Dever for $3,000, secured by mortgage
on property on 112th street, New York City. Interest was paid on
this mortgage to December 1, 1874, when default was made. The
executors foreclosed, subsequently taking title to the property on
February 15, 1875. The property was carried by the trustees until
June 9, 1899, when it was sold for the net sum of $9,405. The cost
of carrying the property, including taxes and assessments, costs of
foreclosure, and other expenses, was paid out of principal. This
amounted to $2,108.15, which, together with the amount of the mort-
gage, makes a total of principal put into the property of $5,108.15.
The amount of income withheld is the interest which would accrue
subsequent to December 1, 1874, upon the principal invested in the
property or used in carrying it.

By the account it appears that out of the proceeds of the sales of
these properties the trustees have returned to principal all the princi-
pal that had been originally invested, and all that had been contrib-
uted to carry the properties as well. The residue of the proceeds
they have credited to income on account of accrued interest, which
will net the life beneficiaries a little less than 5 per cent. interest upon
the total principal put into the properties. To this treatment of the
proceeds the contestants, representing the remaindermen, object,
and, with an insistence like unto that of a character in the "Merchant
of Venice," say they are entitled to the entire proceeds of sale, and
that the surplus, over and above the amount of the mortgages and
the principal used for carrying charges, is an accretion of principal
solely. Not only do they say this, but they also claim that the taxes
upon these properties are a proper charge against the life beneficia-
ries, and should have been borne by them. The claim is that the re-
maindermen are entitled to the entire proceeds of the foreclosed
properties, and about $10,000 more, from the life beneficiaries on ac-
count of taxes. The position of the contestants recalls the questions
propounded by Mr. Justice Cullen, in his vigorous and classic style,
in Matter of Rogers, 22 App. Div. 436, 48 N. Y. Supp. 181, when he
asks:

"Why should the life tenant fast for twenty-five years, that the remainder-
men may feast at the end of that period? Why should each not have ex-
actly his own, so far as it is possible to ascertain it?"

The rights of the parties in the proceeds of the sale of these par-
cels of real property are to be regulated by some sure rule. There
must be some legal policy to govern trustees in the administration
of estates, because such a situation as now presented—the invest-
ment on bond and mortgage, the foreclosure, the buying in, the car-

rying until a favorable time for a sale, and the subsequent sale at a profit—is, in the business of testamentary trustees, a matter of daily occurrence. Trustees are entitled to have pointed out a rule which they can follow without fear of having their conduct challenged. The rule should be applicable as well to a case where the whole amount of the trust estate is invested in a defaulted mortgage as to one where only a fractional part is so invested. So, in viewing this case and in ascertaining the rights of life beneficiaries and remaindermen, we may have in mind that the money invested in these two mortgages might have been substantially the entire trust estate.

The purchase of the property by the trustees at foreclosure was not an investment in real property, for the trustees had no power under the testator's will to make an investment of that character. Even if the testator had authorized an investment in realty, such an investment in unimproved property could only be valid upon the theory that all profit which accrued therefrom was income, and not principal. To hold that authority might be given to invest principal in unimproved real property, and that the appreciation belonged to principal, would be, in effect, permitting a violation of the law against accumulations, other than during the minority of an infant. The purchase of the property was, in effect, an act intended only as temporary, in order to prevent immediate loss to the estate. The form of the security, although physically realty, was still to be regarded as personal property, and would eventually have to be distributed as such. The taxes thereon, in a sense, were not annual taxes imposed against the trust estate, but a charge against this particular piece of salvage, which the executors had taken temporarily in the exercise of their prudent judgment. The taxes were part of the general expenses to which the estate was put in an effort to prevent loss. The amount of the foreclosed mortgage, together with the expense incurred for the foreclosure, the carrying charges, and the amount of the loss of income suffered, should constitute one common account, and, upon the liquidation of the account by sale of the property taken in, the interests are to be adjusted, and each party—life beneficiary and remainderman—is to get "exactly his own, so far as it is possible to ascertain."

The contesting remaindermen urge that weight should be given to the intention of the testator, which they claim is apparent from the will, namely, that the life beneficiaries were to have only the income, and nothing more; and they give the word "income" only that meaning which it has when used in reference to usury or interest. In construing a will containing a trust of the character of the one before us, we must have in mind that the primary objects of testator's bounty are the life beneficiaries, his children. The will before us is no exception to this general proposition. It is clear, under the terms of Mr. Marshall's will, that those who would finally take the remainder would undoubtedly be persons whom he had never known in life, and who had never commended themselves to his benevolent consideration. We must also have in mind that while we may search a will for an intention to make principal distributable as income, and then

execute such an intention, we may not search to the contrary, because to do so would be endeavoring to find an illegal purpose. Matter of Rogers, supra. I quote from Mr. Justice Cullen in that case:

"If from the will of the testator it is apparent that he intended that the life tenant should receive as income that which, as a strict matter of law, would be principal, undoubtedly that intent should govern, for the testator could give the life tenant the power to consume the whole principal. Such was the case of Matter of James, 146 N. Y. 78 [40 N. E. 876, 48 Am. St. Rep. 774]. But if the intent is in the opposite direction, that that which the law holds to be income shall be treated as principal and go to the remaindermen, it is in effect an accumulation and wholly void. Our laws forbid accumulation except for the benefit of infants in being during their minority. No principle of public policy declared by our statute law has been more firmly and rigidly upheld by the courts than this inhibition against accumulations. The accumulation must not only be for infants, but it must be exclusively for infants—so much so that, if an adult or person not in being is to share in the accumulation, then a trust for the accumulation is void."

It is also urged by contestants that the life beneficiaries, by virtue of former accountings and decrees entered therein, in which it appeared that the expense of carrying the foreclosed properties had been charged to principal, are estopped from now claiming that any part of the proceeds of such properties belongs to income. But in this claim there is no merit. As to the effect of such decrees, all that can be said is that they were a justification to the trustees in continuing to carry the foreclosed properties in the principal account. The allowance of their accounts by decree created the law of the case only to the extent of justifying the trustees' action in relieving them from personal responsibility therefor. The rights in a fund not then distributable could not have been determined by such decrees. They judicially settled and allowed what had been done, and what was then immediately ready to be done, in the way of distribution, and were res adjudicata to that extent. The future conduct of the trustees and the future distributions were subject to future judicial investigation. Matter of Hoyt, 160 N. Y. 607, 55 N. E. 282, 48 L. R. A. 126; Rudd v. Cornell, 171 N. Y. 114, 63 N. E. 823; Code Civ. Proc. §§ 2724–2734.

These former decrees were correct. The surrogate allowed and adjudicated the accounts as presented. The carrying charges of foreclosed properties were properly paid out of principal for the time being, but, now that the properties are sold, the account is closed, liquidation takes place, and a distribution is to be had. This is the first time that the question of the rights of the life beneficiaries and the remaindermen in the proceeds of sale could have been adjudicated. The rule to be applied to the distribution of these proceeds, I think, is clearly and unequivocally laid down in the case of Meldon v. Devlin, 31 App. Div. 146, 53 N. Y. Supp. 172; and the rule so established, together with other questions, was certified to the Court of Appeals, and was there affirmed. 167 N. Y. 573, 60 N. E. 1116. This authority seems to have escaped the notice of all of the counsel in this case. Nevertheless this is not strange, because the compilers of our working digests seem to have failed to appreciate the importance of the

rule established. I quote from the prevailing opinion of Mr. Justice Barrett in that case:

"We think the court below rightly disposed of the proceeds of the sale of the water lots. These were two lots upon which the trustees originally held two of the Phillips mortgages, aggregating about $25,000. In 1885 the mortgages were foreclosed, and the trustees bought in the property. In 1893 Jeremiah Devlin, as surviving trustee, sold it to the defendant Felix for a sum less than the principal and interest of the original mortgages. The judgment directs that the proceeds of sale be apportioned between the principal and income of the trust fund in the ratio which the aggregate principal of the mortgages bears to the whole unpaid interest. This was correct. The land represented the original investment in the mortgages, and its proceeds should be distributed in the same manner as though the mortgages were being foreclosed for the first time for the amount of the purchase price. It is well settled that where the interest upon mortgages is unpaid, and the premises are eventually sold, the sum received should be ratably apportioned between principal and income. 2 Lewin, Trusts (Am. Ed. 1889) p. 1228; Matter of Moore, 54 L. J. Ch. 432; Hagan v. Platt, 48 N. J. Eq. 206 [21 Atl. 860]. This is not a case of devastavit, and cases like Cook v. Lowry, 95 N. Y. 103, have no application."

Under this rule the only unknown quantity to be found is the amount of income invested in the foreclosed property. The amount of principal is known. And when we find the amount of income, or, rather, the rate at which income should be computed, the operation of the rule, then, is a sum in arithmetic. In this case the mortgages which were foreclosed bore at the time of foreclosure 7 per cent. interest, but since then the value of money has continually depreciated, and therefore it would not be equitable to continue to compute the interest at the original rate. After careful consideration of the prevailing rates which have obtained for the use of money during the past 25 years, I find that in this case interest may properly be computed upon the principal put into the foreclosed properties at the rate of 5 per cent. per annum. So applying the rule above stated to the facts and figures of this case as I find them, the result is that the life tenants would be entitled to more than the surplus over and above the principal moneys invested in the properties. This surplus would give the life beneficiaries interest at the rate of between 4 and 4½ per cent., and, as they are satisfied to have their interest adjusted on that basis, the accounts will be settled accordingly; returning to principal all the principal invested, and giving to the life beneficiaries the surplus of the proceeds of sale. The interests of the representatives of the deceased life tenants will have to be adjusted by an allowance to them of a proportionate amount of interest calculated to the date of death.

Decreed accordingly.