254

In the Matter of the Estate of WILLIAM MANGER, Deceased.

Surrogate's Court, Westchester County, June 17, 1937.

*Ross, Dodge & Miller,* for the petitioners.

SHEILS, S. The substituted trustees have applied for instructions as to the disposition of the proceeds of sale of certain real property constituting one of the assets of this trust.

The will of this decedent was admitted to probate on October 9, 1928. It established nine separate trusts for the benefit of a like number of his nephews and nieces. The trust for the benefit

of this life tenant, a niece of the decedent, is contained in subdivision h of paragraph third of said will, which provides as follows:

" (h) He shall hold one thousand shares of the preferred stock of the Bell Securities Company and ten shares of the common stock of the said Martha Washington Operating Corporation, in trust, during the lifetime of my niece, Helen Manger, paying to her the annual income thereof during her life, up to the sum of Five Thousand Dollars per annum, and any excess of annual income derived from said stocks shall be paid by my said Trustee to my residuary legatee, and on her death shall pay the principal of said trust to the lawful children of her body who are living at the time of her death and the issue then living of any deceased child of my said niece, *per stirpes* and not *per capita*. If there is no person entitled under the foregoing provisions of this subdivision ' (h),' I give and bequeath the principal of said trust fund to my residuary legatee hereinafter named as part of my residuary estate."

Paragraph fifth of the will gave authority to the residuary legatee, in his sole discretion, to personally substitute in place of the securities comprising the principal of each of the trust funds mentioned in paragraphs a, b, c, d, e, f, g and h of his will, the sum of $100,000 in cash or in legal securities at the par value thereof.

Julius Manger, brother of the decedent, was named as residuary legatee. He was also named as sole executor and trustee under the will with the proviso that, in case of his death or resignation or refusal to act, the five oldest nephews or nieces of the decedent, who are beneficiaries of the trusts under the will, be appointed as his executors or trustees as they respectively arrive at the age of twenty-one years.

Acting under the authority granted in paragraph fifth of the will, the residuary legatee substituted $100,000 in cash as the principal of this separate trust in lieu of the stock originally contained therein.

In August, 1933, Julius Manger resigned as trustee of all of the trusts under said will excepting the trust for Laura Myers mentioned in paragraph third, subdivision 1, thereof. Thereafter these trustees duly qualified as substituted trustees of said trusts.

The facts as stipulated are as follows:

On or about April 4, 1931, the then duly qualified and acting trustees of the trust for the benefit of Helen Manger Douthit, purchased a prior interest of $45,000 in a certain bond and mortgage for $50,000, covering premises known as No. 2123 Eighty-fourth street, Brooklyn, N. Y., said premises being fifty-two feet by one hundred feet, upon which there was a four-story apartment house containing sixteen apartments. By its terms, the mortgage

was due on November 1, 1933, with interest at six per cent per annum, payable semi-annually. It contained no amortization agreement. A subordinate interest of $5,000 in said mortgage was owned by the Marshall Mortgage Corporation.

On or about November 29, 1935, the trustees began an action to foreclose the mortgage because of the failure of the owner to pay a balance of interest due May 1, 1935, and the second half of the taxes on said premises for the year 1935. Prior to the institution of these proceedings, the owner of the property executed and delivered to the trustees an assignment of the income from said property. Pursuant to a judgment entered in the foreclosure action, the property was sold at public auction and was bid in by the plaintiff trustees. On May 6, 1936, they took title to said property. In the foreclosure action, the Marshall Mortgage Company was made party defendant and their subordinate interest of $5,000 in the $50,000 mortgage was cut off.

During the pendency of the foreclosure proceedings, that is, from November 29, 1935, to May 6, 1936, the trustees collected, under their assignment, gross rents in the sum of $3,306.50 and expended for necessary operating and carrying charges $3,073.88, leaving a net income for that period of $232.62. From May 6, 1936, to July 1, 1936, the date of the sale of the premises as hereinafter mentioned, the trustees collected the sum of $1,324 in rents and expended $448.75, leaving a net income for this period of $875.25 and a net aggregate income from November 29, 1935, to July 1, 1936, of $1,107.87.

On July 1, 1936, the trustees sold the premises to 21–23 84th Street Corporation for the sum of $48,300, receiving cash in the sum of $3,300 and a purchase-money mortgage for $45,000. By its terms the purchase-money mortgage becomes due on July 1, 1939, provides for the payment of $200 quarterly on account of principal, beginning July 1, 1937, and the interest rate is five and one-half per cent per annum, payable quarterly. The only expenses involved in the acquisition and subsequent sale of the premises were the foreclosure expenses, amounting to $818.25, and the necessary legal and other expenses on the subsequent sale which amounted to $124, making a total of $942.25.

On May 6, 1936, when the trustees took title to the property under the foreclosure proceedings, the interest in default on the mortgage amounted to $3,095, no part of which has been paid to the life tenant. Also, no income has been paid the life tenant on account of the interest accruing during the period intervening the acquisition of title and the subsequent sale on July 1, 1936.

The request for instructions relates to the manner of apportion-

ment of the proceeds of sale of the foreclosed property between the life tenant and the remaindermen. A determination of this question involves the application of the principles laid down by the Court of Appeals in *Matter of Chapal* (269 N. Y. 464, at p. 472), wherein the court said: " We have now another problem — that of the liquidation of real estate acquired of necessity because of default on a mortgage investment.

" In such an investment situation what is involved is the salvage of a security. The security it is to be remembered is a security not for principal alone but for income as well. On a sale, therefore, the proceeds should be used first to pay the expenses of the sale and the foreclosure costs and next to reimburse the capital account for any advances of capital for carrying charges not theretofore reimbursed out of income from the property. Then the balance is to be apportioned between principal and income in the proportion fixed by the respective amounts thereof represented by the net sale proceeds. In the capital account will be the original mortgage investment. In the income account will be unpaid interest accrued to the date of *sale* upon the original capital. The ratio established by these respective totals determines the respective interests in the net proceeds of a sale. Since that matter has not been argued before us, we do not fix the rate at which interest is to be computed.

" This method of apportionment for cases of the present type is not novel. Its essential principle was recognized and applied in *Meldon* v. *Devlin* (31 App. Div. 146; affd., 167 N. Y. 573). (See, also, *Matter of Marshall*, 43 Misc. Rep. 238.) Of course, that method may not be used when a will or trust indenture prescribes a valid contrary course."

Applying these principles to the case at bar, the foreclosure charges and the expenses incurred on the subsequent sale are first liens on the proceeds of sale and, therefore, must be deducted from the purchase price, and the income account reimbursed to the extent that the trustees have borrowed therefrom for use on the salvage operations. (*Matter of Chapal, supra; Matter of Crimmins*, 159 Misc. 499.)

The stipulation of facts shows that the trustees received the following amounts in cash: Net rents collected from November 29, 1935, to July 1, 1936, $1,107.87, plus the sum of $3,300 received on the sale of the property, a total of $4,407.87. From this amount they have deducted the foreclosure expenses and expenses of sale amounting to $942.25, leaving a balance in their hands of $3,465.62.

In *Matter of Crimmins* (*supra*, at p. 500) the court said: " Under the direction of *Matter of Chapal* (*supra*) no net income derived

from the operation of any property taken over by reason of foreclosure can be applied for the use of the beneficiary of income unless principal has first been reimbursed for all such advances. Until the respective balances of principal so used have been refunded the surplus rents received in each case must be applied first to reimburse principal. Only if a surplus of net income still remains after all principal advances to salvage a particular investment have been repaid may the trustees exercise any discretion in favor of the income beneficiary. Even when the principal advances are fully repaid there still remains a discretion to be exercised by the trustees whether surplus income in their hands from any property will be paid over to the beneficiary of income or be reserved for possible further needs of the respective property."

The trustees may accordingly, in their discretion, pay over to the life beneficiary on account of the income due her, the net rents collected by them during the period from November 29, 1935, to July 1, 1936, after having first deducted the expenses of foreclosure and the subsequent sale of the property.

With regard to the salvaging operation, it is held that the proceeds of sale of the foreclosed property constitute both principal and income and should be apportioned between them. The principal is the original amount of the mortgage investment, $45,000. The income is the unpaid interest accrued to the date of the sale upon the original principal. (*Matter of Chapal, supra.*) The income of which the life beneficiary of the trust has been deprived should be computed upon the amount of the mortgage at the rate of six per cent, which is the rate reserved in the mortgage from the date of the last interest payment by the owner of the premises to the date of the acquisition of title by the trustees. Thereafter, and until the sale of the property, interest is allowed at the rate which generally prevailed for legal investments during this period. Such prevailing rate is fixed at four per cent. (*Matter of Otis*, 158 Misc. 808, 812.)

Having determined the manner of apportionment, the remaining question is whether the amount apportioned to income will be paid to the life tenant wholly out of the cash proceeds of sale or partly out of cash and the balance by participation in the purchase-money mortgage.

I am of the opinion that the cash and the purchase-money mortgage received upon the sale should be apportioned between the principal and income accounts so that each will receive proportionate shares in both. (*Matter of Chapal, supra; Matter of Otis, supra.*) While the purchase-money mortgage no doubt exceeds the amount permissible for investment by these trustees if they were making

a new mortgage loan on the property (Dec. Est. Law, § 111), they are dealing with a salvage operation. " The operation was not complete until the original capital had been recouped as far as was possible. The trustees had on their hands a piece of real property. They were charged with the obligation of diligence, honesty and fidelity in disposing of it on the best terms which seemed at the time to be available. They were necessarily clothed with a business discretion as to the manner in which they would further carry their salvage operation. The foreclosure of the land so as to get possession of it was only part of the salvage operation. So, too, the putting in of new capital was part of the salvage operation. So, too, was the decision to operate or not to operate the property while awaiting a purchaser. So, too, must necessarily be the determination when and on what terms to sell. No question could be made of illegality in taking title to the property. The taking back of a purchase-money mortgage is in effect a continued reservation of the title to the extent necessary to collect the balance of the purchase price. (*Boies* v. *Benham,* 127 N. Y. 620, 624; *Dusenbury* v. *Hulbert,* 59 id. 541.) Prudent and honest decisions suffice to protect trustees against surcharge in making sales of foreclosed properties." (*Matter of Crimmins,* 159 Misc. 499, 501, 502.)

I am of the opinion that both the life tenant and the remaindermen should share the responsibility of liquidating the new security, *i. e.,* the purchase-money mortgage, and that the amortization payments provided for in the mortgage should be made in proportion to the respective interests of the life tenant and the remaindermen therein.

Submit decree accordingly.