## Dornan's Estate

*Homer G. White,* for accountant and life tenant's estate.

*Bronte Greenwood* and *Henry S. Borneman,* for remaindermen.

VAN DUSEN, J., February 4, 1933.—Thomas Benton Dornan died June 11, 1924, and by his will gave the residue of his estate in trust to pay the income equally to his sisters, Margaret and Mary, and the survivor of them, and after the death of the survivor gave certain legacies, and gave the residue to the Masonic Home at Elizabethtown.

Mary Dornan died March 3, 1925, and Margaret Dornan died August 17, 1932. The account is filed because the trust has come to an end.

The gift to the legatee described in the will as "Home for Crippled Children which Home is to be erected by the Lulu Temple A. A. O. M. S. of Philadelphia" is payable to "Shriners' Hospital for Crippled Children".

Included in the balance for distribution is a mill property at Howard, Oxford, and Mascher Streets, Philadelphia, upon which the trustees held a purchase-money mortgage of $125,000, reduced to $105,000. This mortgage was foreclosed, and the property was bought in by the trustees and is still owned by them. The sheriff's sale took place November 2, 1931. The judgment on which the sale was had included principal of $105,000 and interest at 6 percent from September 30, 1930, to October 8, 1931, $6,440.

There is enough to pay the legacies without resorting to the mill property. The Masonic home is entitled to all the principal, subject to payment of these legacies; and it claims that the mill property which now stands instead of the mortgage is all principal. The executors of Margaret Dornan claim an interest in the mortgage, proportionate to arrears of interest accrued down to the time of the sheriff's sale. At the time of the sheriff's sale, the expenses of the sale and the arrears of taxes had to be paid, and the property has now cost principal $108,304.64, and taxes are accruing all the time, with no income to pay them.

It is surprising how little authority there is in the books on this subject. The reported cases deal with actual salvage, and not potential salvage. In all that I have seen, where the property was bought in, it has been sold, and awards could be made in money to the respective parties. We have here a problem of the future; nevertheless, some award must be made now.

All the cases, as we shall see later, give the life tenant some interest in the salvage, though the extent of it varies. None of the cases contains much discussion. I have put down and rejected several statements of what I thought should be the rights of the parties with respect to fractional interest and the

amount thereof, the loss on resale, the profit on resale, the ownership of income, the burden of carrying charges where there was income and where there was no income, and other problems. There seems to be a practical and serious objection to every scheme which is logically consistent in all its parts. It will be better to wait, as far as possible, until something has happened, and we have a fund to dispose of before we distribute it. Wisdom sometimes comes upon facing the actual accomplished fact.

As I have said, all the authorities agree that the life tenant has some interest, and it seems to me that this must be so. According to its terms, the mortgage secures interest as well as principal, and prudent management and regard for the welfare of both parties so requires. If the foreclosure sale raises a fund sufficient to pay both, of course the interest is realized in full and goes to the life tenant. If a fund is raised which is not sufficient to pay both, then principal and interest should share in the fund pro rata. The trustee represents the one no more than the other (if anything, the life tenant is the testator's favorite), and what he does he is doing equally for both. There is no shuffling around of parties at the moment of sheriff's sale which causes the trustee to lose one of his beneficiaries in the process.

If then the trustee buys in the property, he ought to hold the property for the same people who would have been entitled to the fund if the sale had been successful in raising a fund. The trustee buys because he has to. We know very well he buys for a nominal sum oftentimes, when the property has very considerable value. Under actual conditions—and there are plenty of them now going on every month to inform us—the only result of the sale is to give the owner or junior lienholders a chance to protect themselves, and to foreclose them if they do not. Suppose the trustee bids up to 80 percent and a third party actually buys for 81 percent. A fund is raised, and the life tenant shares in the proceeds. But suppose the trustee, exercising good judgment, bids to 82 percent and no one else outbids him, could it possibly be that as a result of this accident income loses everything? If that is the result of the theory of what has happened, then the theory is wrong.

To award this piece of real estate to the parties in fractional interests creates great practical difficulties. Who is going to advance carrying charges? Who is going to determine the resale price? What is going to prevent a partition at the instance of one party, with a probable freezing out of a small interest? It is true that these problems are present to all tenants in common.

To force a sale now would produce just the result that the property was bought in to avoid, namely, the sacrificing of the value of the property, possibly to the damage of both parties, and most probably to the greater damage of the small interest.

This is a testamentary trust. It is in the control of this court. Until these problems of liquidation are solved, it seems to me that the trust is not at an end. There are fortunately other funds in the trust. It is true that the life tenant has no direct interest in the other funds. But all the items make one fund, and I think the life tenant is entitled to reasonable protection for her interest in the use of the other funds to protect this item in which she does have an interest. This item has already been protected before the life tenant's death, by the use of other funds of the trust to pay foreclosure expense and taxes. No one objects to this, and it is common and necessary practice. It seems to me that the life tenant has a similar right, until she is paid off, though the accrual of more income to her has ceased by reason of her death.

I will therefore award the mill property back to the trustee, together with a fund of $10,000, the principal of which fund and income thereon may be used

toward preserving the property so far as necessary. The ultimate burden of the charges can be determined when the trust is ended.

The cases to which I referred above are as follows:

Rahm's Estate, 45 Pitts. (O. S.) 453 (devastavit) ; Colket's Estate, 20 W. N. C. 71 (Phila.) (sale of defaulted bonds) ; McTighe v. Keystone Coal Co., Limited, et al., 99 Fed. 134 (cash proceeds of foreclosure sale) ; Hagan, Trustee, &c., v. Platt et al., 48 N. J. Eq. 206; Tuttle's Case, 49 N. J. Eq. 259; The Trenton Trust and Safe Deposit Co., Trustee, v. Donnelly et al., 55 Atl. 93 (N. J. Eq.) ; Meldon v. Devlin et al., 31 App. Div. 146, affirmed in 167 N. Y. 573; In re Moore, L. J., 54 Ch. 432 (apportionment of proceeds of resale of mortgaged property bought at foreclosure sale) ; Parsons et al. v. Winslow, 16 Mass. 361; Veazie v. Forsaith et al., 76 Me. 172; Greene v. Greene, 19 R. I. 619; Cox v. Cox, L. R. 8 Eq. 343; In re Hubbuck [1896], 1 Ch. 754 (salvage from the obligation of an insolvent).

The remainderman argues here that Pennsylvania is peculiar in not allowing the life tenant any "gains" or "profits"; that the cases cited are from jurisdictions which do allow such participation and which in general show a different attitude toward principal and income from our own; and that the life tenant can have no part in gain on resale. That may be: Neel's Estate (No. 2), 207 Pa. 446; Leech's Estate, 4 D. & C. 1. But no case here or elsewhere is produced which holds that a life tenant loses all interest in a mortgage unless the foreclosure sale raises a cash fund sufficient to reach him after principal is satisfied. . . .

### Supplemental adjudication

Upon consideration of the annexed stipulation entered into by counsel for the executors under the will of Margaret Dornan, deceased, and counsel for the Masonic Home at Elizabethtown, residuary legatee, who have compromised the claim made on behalf of the Estate of Margaret Dornan, deceased, by agreeing that $3,500 of the value of the property taken in foreclosure should be considered as income and the balance as principal, and that this sum should be awarded the said estate composed of the $3,200 bond and mortgage on premises 3720 North Fifteenth Street at the value of $3,200 and $300 cash, and that the mill property shall not be held for further accounting but shall be awarded forthwith to the residuary legatee; the adjudication of December 23, 1932, is modified as follows:

Balance shown by adjudication before distribution.......$194,512.81
Less $3,200 bond and mortgage on 3720 North Fifteenth
Street, which is transferred to income account together
with $300 cash as stipulated........................  3,500.00

$191,012.81

which, composed as indicated in the account, is awarded: $5,000, less tax, to Shriners Hospital for Crippled Children; $5,000, less tax, to Presbyterian Home for Aged Couples at Bala, and the balance to Masonic Home at Elizabethtown, Pa., subject to tax.

The adjudication shows a balance of income of..............$6,234.55
to which add amount transferred from principal................ 3,500.00

$9,734.55

which, composed as indicated, is awarded: $3,200 bond and mortgage on 3720 North Fifteenth Street and $300 cash to the executors of Margaret Dornan as stipulated; income accrued to August 17, 1932, subject to distribution already made to the executors of Margaret Dornan; interest on the two $5,000 legacies

from August 17, 1932, is awarded to the legatees, and the balance of income is awarded to the Masonic Home.

And now, February 4, 1933, the adjudication of December 23, 1932, as herein amended, is confirmed nisi.

NOTE.—Exceptions filed to the foregoing adjudication were withdrawn December 11, 1933, with the approval of the court.