In the Matter of the Estate of HARRY PELCYGER, Deceased.

Surrogate's Court, Kings County, January 21, 1936.

*Hutter & Rosenbloom* [*Lester M. Rosenbloom* of counsel], for the individual executor-trustees.

*Baldwin, Hutchins & Todd* [*Gilbert Lefferts* and *Milton C. Rose* of counsel], for the president and directors of the Manhattan Company, as executors and trustees.

*Eugene Pelcyger* [*Arthur I. Goldstein* of counsel], for Sarah Gradus and twelve others, adult remaindermen.

*Arthur I. Goldstein,* for Eugene Pelcyger, remainderman.

*James S. Regan,* special guardian, for Florence Pelcyger and twelve others, infant remaindermen.

*Abraham Unger,* for Fannie Pelcyger, widow and life beneficiary.

WINGATE, S. Whereas the financial results to any party to this contested accounting proceeding will vary only to a comparatively insignificant degree, no matter what result is achieved in the determination of the presently litigated issues, the underlying principles involved are of vast significance, not merely to the present adversaries, but to a preponderant proportion of persons, whether trustees or beneficiaries, who have to do with trust estates.

The questions involved concern the relative rights and obligations of trustees, life tenants and remaindermen where mortgages, which were a part of the trust corpus, have defaulted, and where the trustees have attempted salvage operations, either by

foreclosure or other means. This is a situation which has occurred with ever-increasing frequency since the financial debacle of the fall of 1929 overturned existing standards of values, and happy, indeed, is the trust estate which has not in the interval encountered an experience of this variety.

Unfortunately, as will hereinafter appear, the rules of conduct in such situations, heretofore formulated by the courts, are in somewhat serious conflict, with the result that the legion of affected interests has been compelled to flounder in semi-darkness with no adequate judicial guidance to illuminate the path which they should pursue.

The affairs of the present estate present such a varied series of diverse situations that it is to be hoped that their solution may afford material aid in most of the problems of this variety which have already arisen and whose solution will be required with increasing frequency during the next few years.

The present decedent died on September 25, 1929, leaving a will executed on November 15, 1926. By its terms, after the deduction of a specific bequest of his personal belongings and two general legacies, aggregating $10,000, his entire estate was devised and bequeathed to his testamentary fiduciaries in trust: " To invest the principal thereof and reinvest the same and pay the income thereof as and when the same accrues, to my beloved wife, Fannie, during the term of her natural life."

Upon her death the remainder of the trust was given to others.

At the time of the death of the testator his estate was valued at approximately $143,000, consisting of one parcel of improved and income-producing realty, valued at $27,500, $1,447.40 in cash, other miscellaneous personal property appraised at $1,383, and thirty-five bonds secured by *second* mortgages on real property, possessing an aggregate estimated worth of $111,371.86.

The will contained no express authorization to the fiduciaries to hold other than legally authorized investments and its ninth item expressly limited their investments to securities of this type. By reason of the promptness after the death of the testator of the incidence of the general financial downfall, the executor-trustees were, no doubt, prevented from effecting a voluntary liquidation of these non-legal securities in the usual course. No one complains of this fact, however, and it is, therefore, not a present issue.

The situation in this regard, therefore, is that the present accountants have properly continued to hold as the investments of the trust an improved parcel of real property and a considerable number of bonds secured by second mortgages. In the process

they have encountered many of the vicissitudes attending such assets during the intervening period. That they have acted with diligence and judgment in solving the problems which have arisen, is best attested by the fact that no objections have been interposed to their acts in this regard, the sole points of difference asserted concerning the proposed method of allocation of the proceeds of the salvage operations which have been made necessary by reason of defaults upon some of the properties and securities held.

In their advocacy of applicable principles of allocation of proceeds, the parties are divided into four camps: *First,* the two individual trustees; *second,* the corporate trustee (hereinafter designated " the bank "); *third,* the adult remaindermen, and *fourth,* the special guardian for infant remaindermen. No two of these wholly agree respecting the principles properly applicable. The life tenant is not separately represented, but her interests appear to be fully protected by the first two parties named.

The briefs of all of the litigants are lucid and helpful to an unusual degree. Each states its premises and arguments clearly and with as great brevity as the circumstances will permit, and to each of the four able arrays of counsel the court gladly pays its debt of gratitude for their constructive assistance in the solution of the problems presented for decision.

The properties in relation to the affairs of which issues have arisen are eleven in number, and since the events which have transpired in respect to each differ in some respect, it becomes necessary at the outset to define the salient points in respect to each case.

The first is designated " K-11." This was a bond of Eva and Anna Gutkovitz secured by second mortgage on premises 2030 East Twelfth street, Brooklyn. It was originally in the sum of $2,500, but was, prior to default, reduced to $1,550 by amortization payments. Interest at the reserved rate of six per cent was paid to February 14, 1934, but not thereafter. On June 23, 1934, an arrangement was made for an exchange for Home Owners' Loan Corporation three per cent bonds, and on that date the trustees received:

Authorization for three per cent H. O. L. C. bonds of

| | |
|---|---|
| a face value of.................................... | $1,150 00 |
| Accrued interest on said bonds...................... | 4 97 |
| Cash adjustment................................. | 20 03 |
| **Total.......................................** | **$1,175 00** |

The bonds themselves were received on August 16, 1934, and were promptly sold on the open market, yielding $1,141.02, and thus showing the following gross receipts:

| | | |
|---|---|---|
| Proceeds of bonds | $1,141 | 02 |
| Accrued interest to sale | 10 | 06 |
| Cash adjustment | 20 | 03 |
| Total | $1,171 | 11 |

The individual trustees propose to allocate $1,139.88 to principal and $31.23 to income, basing their allowance on an income computation at six per cent to June twenty-third and at four per cent thereafter, giving a total earned income of $42.46 which is added to the unpaid principal, giving a total investment of $1,592.46. The ultimate sum realized is then prorated on the basis of 42.46/1592.46 to income and the balance to principal.

The bank adopts the same general method of allocation but figures income at six per cent from the date of default to the date of receipt and sale of the bonds, which results in giving principal $1,136.44 and income $34.67.

The remaindermen and guardian adopt the position that no income should be paid the life tenant except that which was actually received, apparently, therefore, assigning $5.09 to income and $1,166.02 to principal.

The second property in controversy, designated K-27, was a bond of Louise Salavatore, secured by second mortgage on premises 2318 Sixty-first street, Brooklyn. This was originally in the sum of $1,375, which, at the time of the default, had been reduced to $625. Interest at six per cent was paid to August 1, 1933, but not thereafter. On December 20, 1934, the trustees received in exchange:

| | | |
|---|---|---|
| Authorization for Home Owners' Loan Corporation 2¾ per cent bonds | $75 | 00 |
| Accrued interest on same | | 78 |
| Cash adjustment | 24 | 22 |
| Total | $100 | 00 |

The bonds, themselves, had not been received at the date of the filing of the amended account.

The individual trustees propose to apportion the cash received on the basis indicated in connection with K-11, giving principal $22.36 and income $1.86, and, when the bonds are received and

sold, to make a second apportionment of their proceeds, using as factors the amounts of principal and income as reduced by the first apportionment payments, the latter, in turn, increased by interest at four per cent on the reduced principal from December 20, 1934, to the date of the sale of the bonds.

To this all the other parties object, contending that only a single apportionment should be made, and that, when the bonds are received and sold.

The special guardian and remaindermen both here and throughout their objections preserve their respective positions that only income actually received as such should be allocated to income, and that income in excess of three per cent on outstanding principal should in no case be allowed.

The third item, designated K-28, was a bond of Augusta C. Towey, secured by second mortgage on 84–41 Sixty-third avenue, Forest Hills West, L. I. This was originally in the sum of $1,850, but at the time of default had been reduced to $1,365. Interest was paid at six per cent to February 28, 1934. On November 9, 1934, the mortgage was exchanged for:

Authorization for Home Owners' Loan Corporation
$2\frac{3}{4}$ per cent bonds................................. $375 00
Accrued interest on same............................ 2 81
New second mortgage............................... 598 42

Total.................................. $1,000 00

Legal expenses in connection with the transaction were incurred in the sum of twenty-five dollars. The Home Owners' bonds had not been received at the date of the account.

The individual trustees propose to hold all of these receipts in suspense until the bonds have been received and sold. The bank assents to this procedure, but the guardian and remaindermen both assert that the new second mortgage should be carried to principal account and should never be made the subject of apportionment.

K-29 was a bond of Edith K. Woolman secured by second mortgage on premises 1466 East Third street, Brooklyn. The unpaid principal was $1,000 and interest at the six per cent rate reserved in the mortgage, accrued and unpaid to November 30, 1934, amounted to forty dollars. On the latter date the mortgage sold for $250 with an attendant legal expense of twenty-five dollars. The individual trustees propose to apportion 40 /1040ths of this sum to income and the balance to principal, in which disposition the bank concurs. The special guardian maintains that no income pay-

ment should be made as none was received, and the remaindermen assert that in no event should income be figured for apportionment purposes at a rate in excess of three per cent.

K-45 was improved property situated at 82–51 Two Hundred and Thirty-fourth street, Queens Village, L. I. Its inventory value was $3,250. It was managed by the trustees until September 7, 1934, at a net loss of $253.12, when it was lost by reason of foreclosure of a first mortgage thereon. The individual trustees propose to write off this total of $3,503.12 as a capital loss. The bank does not object, but the other parties contend that the loss should be apportioned between principal and income.

The next item of property, described in Schedules K-2 and K-46, was originally a bond of Mary Ammerman secured by second mortgage on premises 1559 West Ninth street, Brooklyn. At the time of the default the outstanding principal amounted to $2,400. Interest at the reserved rate of six per cent was paid to December 9, 1931. On April 27, 1932, the trustees accepted a deed of the premises subject to a first mortgage of $8,250. In the process of taking over the property the trustees expended a total of $1,565.86, made up of legal expenses and overdue taxes, $156.10, and arrears of first mortgage interest, $670.90. They have also paid $238.86 for assessments and $500 in reduction of the principal of the first mortgage. The sums necessary for these payments have been tentatively taken from principal account. The property has not only maintained itself since its acquisition but shows a credit balance of receipts over costs of carrying during the period of $332.26.

The property is still on hand, and the individual trustees propose to carry the entire matter, including this profit, in suspense until sale. The bank does not object to the adoption of this course, but both of the other parties assert that the gain from operations should be presently applied in reduction of the $1,565.86 expended in taking over the property.

The seventh transaction is reflected in Schedules K-14 and K-47 of the amended account. This arose by reason of the receipt of the bond of Iva M. Heck, secured by second mortgage on premises 233–08 Seward avenue, Queens Village, L. I. The principal at the time of the default amounted to $1,575. No interest receipts are shown, so that the period of the default in this regard is unascertainable. On February 12, 1932, the trustees acquired the property through foreclosure proceedings subject to a first mortgage of $5,850. The expenses of acquisition were $531.23 for legal expenses and $498.80 in satisfaction of existing tax liens and first mortgage interest to the date of acquisition. The trustees have also paid

$144.19 for assessments and $400 in reduction of the first mortgage. These sums, aggregating $1,574.22, less $59 received from the receiver in foreclosure, have been paid from principal. Since its acquisition the charges of maintenance of the property have exceeded the receipts by $41.81, which has been made good from principal. The individual trustees propose that the entire matter be held in suspense. Neither the bank nor the guardian object, but the remaindermen insist that the loss sustained in operation be apportioned between principal and income.

The greatest difference of opinion between the parties has arisen in respect to the property shown in Schedules K-48 and K-15. As received by the trustees, this was a bond of Walter T. and Jessie M. Herman, secured by a second six per cent mortgage on premises 82–19 Two Hundred and Thirty-third street, Queens Village, L. I. Originally in the sum of $2,150, this had been reduced to $1,525 at the date of the default. Interest was paid thereon to October 1, 1932. On January 6, 1933, the trustees acquired the property by deed, subject to a first mortgage of $6,250. The expenses of acquisition were, legal fees, $123.51, and taxes and first mortgage interest to the date of taking title, $358.32. These items and an assessment of $20.15 were paid from principal, giving a total of $501.98 so charged. The property was operated by the trustees until May 17, 1934. The receipts of operation exceeded the expenses thereof by $428.75. On the latter date the trustees exchanged the property for:

| | | |
|---|---:|---:|
| Authorization for Home Owners' Loan three per cent bonds | $775 | 00 |
| Accrued interest on same | 1 | 01 |
| Cash adjustment | 23 | 99 |
| Total | $800 | 00 |

In connection with this transaction they incurred a legal expense of twenty-five dollars.

| | | |
|---|---:|---:|
| On October 10, 1934, the bonds were received and sold, yielding | $752 | 23 |
| Plus accrued interest | 10 | 20 |
| Total | $762 | 43 |

The individual trustees propose to make a dual apportionment, *first*, as of May 17, 1934, and *second*, as of October 10, 1934. On the former they desire to apportion the profits of operation plus the

adjustment cash, less the last noted legal expense of $25, or a net sum of $427.74. For the purposes of this computation, they first find what they deem to be the average daily principal investment, in which connection they include the unpaid balance of the mortgage and the aforesaid sums, aggregating $501.98, expended to acquire title. Their result determines that the average daily principal investment amounted to $1,906.87.

They then compute the investment by allowing interest at six per cent on the unpaid balance of the mortgage to the time of acquisition of the property and at four per cent on the average principal investment from the date of acquisition to the date of sale. Their result is a total income investment of $128.17, making the total investment, income plus principal, $2,155.15. The $427.74 is then apportioned:

2026.98/2155.15ths of $427.74 to principal........... $402 30
128.17/2155.15ths of $427.74 to income............. 25 44

For the second apportionment, the principal and income figures are altered by a subtraction from the former figures of the respective payments on the first apportionment, and by the addition to income investment of interest on the reduced average principal investment at four per cent. These revised figures give the remaining principal investment as $1,624.68 and the adjusted income investment as $128.54. The proceeds of the bonds and accrued interest are then apportioned:

1624.68/1753.22ths of $762.43 to principal.......... $706 53
128.54/1753.22ths of $762.43 to income............. 55 90

The result of the two apportionments is to give principal $1,108.83 and income $81.34.

The method advocated by the bank is entirely different. It lumps the expenses of acquisition and maintenance, giving a total of $1,133.35 and from this subtracts the receipts from operation, showing a net loss of $98.23. It computes the average additional investment of principal over and above the amount due on the mortgage, taking all expenses and receipts into consideration, as $98.31 and computes the return on this sum for the period, at three per cent, giving $5.22. It then computes interest on the unpaid portion of the first mortgage at six per cent for the entire period during which interest was in default, namely, up to the date of receipt and sale of the H. O. L. C. bonds, arriving at the amount of $186.26. This is added to the unpaid face of the mortgage, giving $1,710.26 as the total investment principal and interest. The succeeding computations are as follows:

| | | |
|---|---|---|
| Total receipts on sale of bonds........................ | | $752 23 |
| Accrued interest on same............................ | | 10 20 |
| Cash adjustment................................... | | 23 99 |
| | | |
| Total....................................... | | $786 42 |
| Less net expenses since acquisition......... | $98 23 | |
| Interest on additional principal invested.... | 5 22 | |
| | | 103 45 |
| | | |
| Net sum for apportionment......................... | | $682 97 |
| They then assign 1525/1710.26ths of $682.97 to principal | | 608 99 |
| | | |
| And 185.26/1710.26ths of $682.97 to income......... | | $73 98 |

The deducted $98.23, which was borrowed from principal for the salvage operation, is restored to it, and the $5.22 interest on this sum is paid to the life tenant who, under the will, is entitled to receive all income earned by the fund.

The guardian contents himself with a flat assertion that the mode of apportionment advocated by the individual trustees is illegal and improper. The remaindermen oppose a double apportionment, and, in general, agree with the bank except that they maintain that interest should be allowed at not exceeding three per cent from the time of the default to the date of ultimate liquidation.

In K-18 and K-49 the bond was that of Cornelius and Elizabeth O'Riorden secured by second mortgage on 2513 Mansfield place, Brooklyn. The unpaid principal was $2,200, with interest at six per cent from April 12, 1932. The property was acquired by deed on June 28, 1932, and operated at a net loss of $77.40 for mere maintenance expenses until July 19, 1934. The additional costs of acquisition were, legal expenses, $123.05; liens and interest on first mortgage to date of acquisition, $367.62. A $75 payment was also made on account of the principal of the first mortgage.

On July 19, 1934, the interest of the estate in the property was sold for:

| | |
|---|---|
| Authorization for H. O. L. C. three per cent bonds..... | $1,350 00 |
| Accrued interest on bonds........................... | 8 68 |
| Cash adjustment.................................... | 2 21 |
| | |
| Total....................................... | $1,360 89 |

In the process an expense item of $4.56 was incurred.

On November 3, 1934, the bonds were received and $1,150 face value thereof sold at 97 25/32 net for $1,124.48. The remaining $200 face value of bonds were held as a principal investment at the same rate, giving an additional value of $195.26. An interest payment of $20.25 was received on November 1, 1934 and accrued interest on the bonds sold amounted to forty-five cents.

The individual trustees compute the amount available for apportionment as follows:

| | | |
|---|---:|---:|
| Proceeds of bonds sold................... | $1,124 48 | |
| Value of bonds retained.................. | 195 56 | |
| | | $1,320 04 |
| Interest received......................... | $20 25 | |
| Accrued interest on bond sold............. | 45 | |
| | | 20 70 |
| Cash adjustment................................ | | 2 21 |
| Total...................................... | | $1,342 95 |
| Less expense...................................... | | 4 56 |
| Net sum for apportionment.................... | | $1,338 39 |

The average daily principal investment is computed in the same manner as in the last previous property considered, and found to be $2,872.73.

The interest investment is computed at six per cent from the last payment thereof to June 28, 1932, and at four per cent on the average daily investment from the latter date to November 3, 1934, the date of sale of the bonds, giving a total of $296.58.

The principal investment, as computed, consists of:

| | |
|---|---:|
| Unpaid mortgage principal........................... | $2,200 00 |
| Cost of acquisition of property...................... | 565 67 |
| Loss on operation of property....................... | 77 40 |
| Total...................................... | $2,843 07 |

The net proceeds are, therefore, divided:

| | |
|---|---:|
| 2843.07/3139.65ths of $1,338.39 to principal.......... | $1,211 96 |
| 296.58/3139.65ths of $1,338.39 to income........... | 126 43 |

The bank maintains the same position as it did in respect to the previous property. It carries the unpaid balance of the mortgage as a separate item and first deducts all receipts of conduct of the property from the total of all expenditures in connection

therewith, arriving at a net loss of $647.63. The respective investments of principal and income are taken as $2,200, the unpaid portion of the bond, and $337.05, interest thereon at six per cent from the date of default to the date of final liquidation.

The average daily additional investment of principal is computed to be $48.22 on which a return at the rate of three per cent is allowed and credited to income.

The apportionment figures as then attained are:

| | | |
|---|---:|---:|
| Cash for distribution | | $1,147 39 |
| Net expenses deducted and credited to principal | $647 63 | |
| Interest on additional principal investment, credited to income | 48 22 | |
| | | 695 85 |
| Net cash available for apportionment | | $451 54 |
| Add value of bonds taken over | | 195 56 |
| Amount to be apportioned | | $647 10 |
| To principal 2200/2537.05ths of $647.10 | | $561 10 |
| To income 337.05/2537.05ths of $647.10 | | 86 00 |
| | | $647 10 |

The objections of the guardian and remaindermen are the same as in connection with the previous item of property except that the latter further insists that the loss in operation of the property should be apportioned between principal and income.

K-50, also shown in K-21, was originally a bond of Sam. and Celia Schneid, secured by second mortgage on premises 1545 West Ninth street, Brooklyn. The property was acquired by deed on April 26, 1932, at which time the unpaid sums amounted to $3,950 principal and interest at six per cent from January 1, 1932. The expenses of taking over were legal, $114.35; taxes and interest to date of acquisition, $669.29, and assessments, $289.72, giving a total of $1,073.36. The property has been operated in the interval at an excess of receipts over disbursements of $232.88. The individual trustees and the bank propose to hold the entire matter in suspense until sale, while the other parties insist on an allocation of the excess of receipts of operation at this time.

The situation respecting K-51 (K-30) is similar, except that possession was secured by foreclosure. The sums unpaid on the mortgage were $1,900, with interest at six per cent from February

7, 1932. The date of acquisition was April 26, 1932. There was expended for legal fees $439.19 and for prior liens and first mortgage interest $256.33. In addition, a $500 payment has been made on the first mortgage. The receipts of operation exceed the expenditures thereof by $140.80. The contentions of all parties correspon٭ with their respective positions in connection with K-50.

It will be apparent from the foregoing that the following questions are presented for decision by the supplemental account and the objections which have been interposed thereto.

1. As to the extent of the rights of an income beneficiary in mortgaged property taken over by trustees upon a default in the performance of the terms of the bond secured thereby.

2. As to the existence and extent of the right of an income beneficiary to receive a sum as, or in lieu of, income other than sums actually received by the trustees therefrom, upon the principal sums invested in a defaulted bond when the mortgaged property has been taken over by the trustees.

3. As to the absolute or relative rights of income and principal in profits realized from the operation of mortgaged property taken over by trustees after default in the bond secured thereby.

4. As to the liability of income and principal to make good losses sustained from the operation of mortgaged property taken over by trustees after default on the bond secured thereby.

5. As to the source from which moneys are to be obtained for defraying expenses necessary to enable trustees to take over mortgaged property upon a default in the performance of the terms of the bond secured thereby, and as to the method of treatment thereof on liquidation.

6. As to the time or times when division of moneys realized from the sale or operation of mortgaged property taken over by trustees after default on the bond secured thereby is to be made between income and principal.

In undertaking the task of ascertaining the pertinent legal principles affecting these questions, as judicially declared, it is essential to distinguish the line of cases based upon the imputed intent of the testator, from those possessing present relevancy. The former are decisions like *Lawrence* v. *Littlefield* (215 N. Y. 561); *Spencer* v. *Spencer* (219 id. 459); *Furniss* v. *Cruikshank* (230 id. 495); *Matter of Jackson* (258 id. 281); *Matter of Satterwhite* (262 id. 339), and *Matter of Rowland* (155 Misc. 826) in which the question determined was as to whether the income beneficiary was under obligation to pay the ordinary carrying charges of unimproved property which had come to the trustees from the testator in that condition, or was not only exonerated from such charges, but

entitled to receive a portion of the proceeds of an ultimate sale in lieu of income in the interval of continued retention. In all such cases the results attained are based upon the presumed intent of the testator as deduced by the court from the language of the will and his situation at the time of its execution, both in relation to the particular unproductive property in question and to the particular income beneficiary. The established rule in this regard is that if at the time of the execution of the will the testator either included a mandatory direction of sale or must have known that the carrying charges on the property would either wholly destroy or seriously impair the value of the gift to an income beneficiary of near relationship, then the testator must have intended to exonerate the *cestui que trust* from the payment of carrying charges and to give him a participation in the ultimate proceeds of sale of the property in an amount equivalent to that which he would have received had the unproductive property been promptly liquidated after the death, the proceeds invested at current rates, and the income paid over in usual course. (*Matter of Rowland*, 155 Misc. 826, 831, 832.)

The present problem is essentially different. Here the gift to the trustees is of an asset item which was productive at the time of the gift and concerning which the testator cannot be deemed to have had any ideas based on the unforeseen eventuality of its passing into another category, in the absence of direct expression thereof, since the only intention which may be attributed to a testator is that which results from the natural implication of the words employed in the will when viewed in the light of the then-existing circumstances surrounding him. (*Matter of McCafferty*, 142 Misc. 371, 372; affd., 236 App. Div. 678; *Matter of Weil*, 151 Misc. 841, 844; affd., 245 App. Div. 822; *Matter of Kellogg*, 156 Misc. 703, 705.)

Since the testator cannot be presumed to have possessed any prophetic vision, it is obvious that the language employed by him in his will cannot have contemplated the subsequent happenings to his property, and the court may not, under the guise of testamentary construction, impute to him an intent which he did not in fact possess, or speculate as to what he would have desired had he survived to witness the actual occurrences. (*Matter of Loomis*, 154 Misc. 549, 552.) The rights of the interested parties are, therefore, not determinable on any basis of testamentary interpretation, but on ordinary principles of trusts.

There are few legal concepts more clearly established than the respective rights of income beneficiaries and remaindermen under ordinary trust instruments. The former, as his descriptive des-

ignation implies, is entitled to the usufruct of the principal fund only, while the ultimate possessory enjoyment belongs to the latter. As is pointed out in *Matter of Albertson* (113 N. Y. 434, 439), " the usual purpose of the testator in providing for a beneficial interest in a trust estate is, that the net income shall be applicable only, and that the *corpus*, or capital, of the trust estate shall remain intact until the trust shall have determined." The sole right of the income beneficiary is " to enjoy a thing the property of which is in another, and to draw from the same all the profit, utility and advantage which it may produce, provided it be without altering the substance of the thing." (*Matter of Frost*, 184 App. Div. 702, 704.) The iterations and reiterations of this basic principle are literally legion, and it has been the uniform determination, except in certain of the cases hereinafter noted, that no charge against principal can be made, unless, viewing the matter from the standpoint of the remainderman, there is a corresponding benefit to the property which he will ultimately be entitled to receive. (*Matter of Boyle*, 140 Misc. 523, 528; *Matter of Shepard*, 136 id. 218, 221.) Were this principle not to be actively and consistently applied, " the exhaustion of the fund will not be long postponed " (*Matter of Ardrey*, 232 N. Y. 109, 111), and the testamentary intent that the remainderman shall receive the entire property except for a temporary withholding of the usufruct will be defeated.

So far as the diligence of counsel and the independent research of the court have disclosed, there are just an even dozen adjudications in the courts of this State bearing upon any of the problems herein raised.

The first, in point of antiquity, is the decision of the First Department in *Meldon* v. *Devlin* (31 App. Div. 146; affd., 167 N. Y. 573). The facts of this case, as disclosed by the record on appeal, differ in certain respects from the pertinent statements of the opinion. The trustees held three mortgages with an aggregate principal of $29,102.50, upon which no interest was paid after September 13, 1875. On March 20, 1885, the trustees obtained title to the mortgaged premises by foreclosure. The expenses of foreclosure and subsequent taxes during the continued retention of the property by the trustees were paid out of income. One of these parcels was apparently sold for approximately $4,560, and at the time of the litigation the remaining two were under contract of sale, consummated on May 17, 1893, for the sum of $23,900, of which $2,390 had been paid.

The decision of the trial court determined that " the proceeds of the sale    *    *    *    represent both principal and income of the trust estate " and " are apportionable between principal and income

\* \* \* in the ratio which the aggregate principals of the mortgages \* \* \* and the interest due thereon from September 13, 1875, to May 11, 1893, bear to each other." (See Record on Appeal, 31 App. Div. 146.)

This result was approved by the Appellate Division (31 App. Div. 146, 158), which says: " The judgment directs that the proceeds of sale be apportioned between the principal and income of the trust fund in the ratio which the aggregate principal of the mortgages bears to the whole unpaid interest. This was correct. The land represented the original investment in the mortgages, and its proceeds should be distributed in the same manner as though the mortgages were being foreclosed for the first time for the amount of the purchase price. It is well settled that where the interest upon mortgages is unpaid, and the premises are eventually sold, the sum received should be ratably apportioned between principal and income. (2 Lewin Trusts [Am. ed. 1889], 1228; *In re Moore*, 54 L. J. Ch. 432; *Hagan* v. *Platt*, 48 N. J. Eq. 206.) "

It is interesting to note in passing that, whereas the second case cited applied the rule here adopted, it purported to do so on the authority of the former case cited, which expressly and emphatically adopts the rule that the basis of the apportionment is the principal of the mortgage and the interest which had accrued thereon *to the date of the foreclosure* and not to the time of the ultimate realization upon the property taken over. In that case the life tenant contended that he was entitled to be reimbursed for the loss of income during the interval between the time of the taking over of the property and the time of its ultimate sale. To this contention the court replied (at p. 433): "But the question before me is whether I have any fund out of which I can compensate him for that loss. Under the mortgage all that could have been got would have been the principal and simple interest \* \* \* (p. 434). I have, therefore, no fund at all out of which I can take the money for compensating the tenant for life in respect of compound interest. If I did allow it, I should be taking it out of other people's money to pay him."

In *Meldon* v. *Devlin*, the mortgages, prior to foreclosure, carried an interest rate of seven per cent. In the apportionment effected interest at the rate of six per cent was allowed to the life tenant for the period from the date of foreclosure of the mortgage until the final disposal of the property. No reason is assigned for the adoption of this rate.

The results attained in the case may be summarized as follows: (1) Expenses of acquiring title to the property are payable from income; (2) carrying charges of the property, when acquired, are

payable from income; (3) on ultimate sale, the proceeds are to be apportioned between principal and income; (4) in computing the basis on which income is to share in the apportionment, not merely interest unpaid to the date of the foreclosure is to be included, but also a sum equivalent to six per cent on the original principal investment for the period from the date of acquisition to the date of disposal.

It is perhaps significant that the briefs of the parties in that case did not refer to any of these determinations except as to the propriety of any apportionment whatsoever, and the *basis* of an apportionment, if one was to be made, received no attention whatsoever by either the parties or the courts.

The next decision, in chronological order, is *Matter of Marshall* (43 Misc. 238), decided by Surrogate SILKMAN of Westchester county in 1904. Two properties presenting problems of the variety here under consideration were there present. In June, 1872, the executors invested $15,000 in a mortgage on unimproved real property. Interest was paid to June 1, 1878, when default occurred. In December, 1879, the executors acquired title through foreclosure proceedings, holding the premises until May, 1903, at which time they were sold for a net sum of $54,500. Costs of foreclosure and all carrying charges, amounting to an aggregate of $16,174.33, were paid out of principal. The second property was a $3,000 bond secured by mortgage, upon which interest was paid to December 1, 1874, when default was made. The executors took title through foreclosure on February 15, 1875. It was carried by them until June 9, 1899, when it was sold for a net sum of $9,405. Here also the costs of carrying the property, including taxes and foreclosure and other expenses, were paid out of principal.

The court held that the amounts finally received on sale should be apportioned between principal and income on the basis of the several investments therein by principal and income. The principal investment in the calculation was ascertained by adding the original principal of the foreclosed bond and all foreclosure and carrying expenses. The income investment was computed by figuring the prevailing rate of interest during the period of holding of the property irrespective of whether any income was actually received from its operation or not. Whereas the rate of interest secured by mortgages was seven per cent the surrogate determined that the prevailing rate during the period was five per cent and intimated that the income investment would ordinarily be computed at that rate for the period of holding. The sum to be allocated to income would then be that proportion of the ultimate

sale price which the income investment, as thus determined, bore to the total of the principal and income investments.

In *Matter of Pitney* (113 App. Div. 845), decided by the First Department in 1906, an intermediate account was before the court for adjudication. A mortgage of $20,000 had been foreclosed and the property acquired was still held by the trustees. The sole question litigated was as to whether the expenses of maintenance should be charged to the income realized from the balance of the trust estate. The court in holding that the actual disbursements of this variety should not be charged to income but to principal, said (at p. 847): " What is paid to protect this property is clearly for the benefit of principal. It is not in any way to produce income, as the only object of protecting the property is to preserve it so that it can be sold for something which will increase the principal of the trust."

In *Matter of Menzie* (54 Misc. 188), decided by the surrogate of Madison county in 1907, the trustee held a mortgage of $4,000 which he was obliged to foreclose and take over the property. He held and rented it for six years at the end of which time he sold it. The question presented for adjudication was whether ordinary repairs, taxes, interest on incumbrances and insurance on the property while held, should be paid from income. The report reads (at p. 196): " Circumstances will, in all cases, change this rule to some extent. In the case at bar, the investment, by force of circumstances has been changed from personalty to realty and, from 1889 to 1897, yielded practically no revenue above an amount sufficient to preserve the fund for the remaindermen; and for so preserving it the life tenant is called upon to pay the expense. This is not proper and cannot be allowed."

In *Patterson* v. *Vivian* (137 App. Div. 596, First Dept. 1910) property was taken over by foreclosure of a mortgage held by the trustees. It appeared that the total rents received were more than $5,000 less than the payments for expenses, taxes and repairs. The property was still on hand at the time of the account and the court held (at p. 605) that any question of apportionment should be postponed until the property had been sold and that a determination should then be made as to the ultimate result of the operation.

The sixth precedent, in chronological order, is *Matter of Brooklyn Trust Co.* (92 Misc. 674; affd., 173 App. Div. 948; affd., 219 N. Y. 565). The trustees received the mortgage there in question from the estate and were compelled to foreclose, and take title to the property. The question raised was as to whether ordinary expenses of maintenance, exceeding income from the property, should be

paid from other income due the life tenant or should be treated in some other manner. Payment from the income of the life tenant was approved.

In *Matter of Myers* (161 N. Y. Supp. 1111, not otherwise reported), decided by Surrogate FOWLER of New York county in 1916, the trustees had invested $14,000 in a bond and mortgage which at the time of default showed a debit balance of $8,000 still unpaid. The trustees acquired the property at foreclosure and held it for nearly twenty years, at which time it was sold for $9,065.73. In the interim the property yielded some income but not sufficient to pay ordinary maintenance charges for taxes, repairs, etc., the deficiency being made good out of principal.

The surrogate (at p. 1113) determined that at the rate of five per cent the income beneficiaries would have received $11,104.70 during the interval upon the total principal invested which apparently included the unpaid balance on the mortgage and the maintenance charges paid from principal, and that there should be an apportionment on this basis. The final result of the decision is, however, somewhat perplexing since the income beneficiary is awarded only $2,129.95, whereas under the decisions in *Meldon* v. *Devlin* and *Matter of Marshall*, there would appear to have been over $4,000 due him.

In *Furniss* v. *Cruikshank* (191 App. Div. 450), decided by the Appellate Division for the First Department in 1920 (modfd. on other grounds, 230 N. Y. 495), the sum of $19,624.83 was invested in a bond and mortgage and after default the property was taken over in foreclosure proceedings by the trustees. The carrying charges of the property during the nine years that it was held by the trustees, including arrears of taxes at the time of acquisition, amounted to $4,312.91. The property was sold for $17,000 and the deficiency of $6,937.74 was charged against principal with no allowance made to the income beneficiary for loss of income.

In *Matter of Jackson* (135 Misc. 329; affd., 232 App. Div. 425; revd. on other grounds, 258 N. Y. 281) it appears that the trustee held a mortgage of $9,000 for which on June 10, 1917, after default, he accepted a deed of the premises to save expenses of foreclosure. At the time the property was taken over the unpaid interest amounted to $1,840. In April, 1919, the trustee sold the premises for $7,250. The court apportioned this sum by allowing principal 9000/10840ths of the sum realized, and by allowing income 1840/10840ths, no allowance being made for loss of income during the period of holding.

In *Matter of Haffen* (155 Misc. 774) the question arose on an intermediate accounting and Surrogate HENDERSON determined

that the carrying charges of property taken over on foreclosure of mortgage should properly be paid out of principal for the time being, subject to adjustment upon liquidation of the account by the sale of the asset, and to future adjustment between income and principal of the proceeds of its sale.

In *Matter of Whitney* (N. Y. L. J. Dec. 11, 1935, p. 2368) Surrogate SLATER of Westchester county made a similar determination, holding that interest paid on money borrowed to protect real property taken over, and for betterment of properties, should be charged to principal. He adds: " The general rule laid down in *Matter of Albertson* (113 N. Y. 434) does not apply where the carrying charges are incurred primarily, if not exclusively, to preserve the corpus and keep it intact for the benefit of remaindermen, or where other special equities are involved which make it unjust to compel the income to bear the carrying charges."

Before undertaking a consideration of the most recent pronouncement on the general subject, found in *Matter of Chapal* (269 N. Y. 464), it may be of advantage to summarize the decisions hereinbefore noted, and to give a brief consideration to the fundamental verities of the situation, shorn of the legal fictions with which it has become involved.

The result of the foregoing authorities on the questions hereinbefore propounded would appear to be:

1. The income beneficiary is entitled to an interest in mortgaged property taken over by trustees on default in the terms of the mortgage, at least to the extent of that proportion of the net proceeds on ultimate sale thereof, which the interest, unpaid at the time it is taken over, bears to the unpaid principal at such time. (*Meldon* v. *Devlin, Matter of Myers, Matter of Jackson.*)

2. The question of the right of the income beneficiary to receive a sum in lieu of income upon unproductive property taken over on foreclosure is in conflict under the decisions. The affirmative was determined in *Meldon* v. *Devlin* (on the authority of a precedent which decided the contrary); in *Matter of Marshall* (on the authority of *Meldon* v. *Devlin*), and in *Matter of Myers* (on authority of *Meldon* v. *Devlin*). The contrary was decided in *Matter of Jackson, Matter of Brooklyn Trust Co.* (*semble*), *Matter of Menzie* (*semble*), *Furniss* v. *Cruikshank.*

3. The rights, if any, of the income beneficiary in profits from the operation of properties taken over is not determined by any of the authorities.

4. The income beneficiary is not required to make good losses sustained in the ordinary operation of properties taken over by the trustees on default in mortgages. (*Matter of Menzie, Meldon*

v. *Devlin* [*semble*], *Matter of Jackson, Matter of Whitney* [*semble*]. *Contra, Matter of Brooklyn Trust Co.*)

5. The moneys for taking over property on default is, in the first instance, to be taken from principal (*Matter of Pitney, Matter of Menzie, Patterson* v. *Vivian, Matter of Whitney, Matter of Haffen*) and is considered as an additional principal investment (*Meldon* v. *Devlin, Matter of Marshall. Contra, Matter of Brooklyn Trust Co.*) which is not to be repaid as such on ultimate liquidation. (*Meldon* v. *Devlin, Matter of Marshall, Matter of Brooklyn Trust Co.*)

6. Division of moneys derived from the sale or operation of the properties is to be made only on final liquidation. (*Meldon* v. *Devlin, Matter of Marshall, Patterson* v. *Vivian, Matter of Haffen, Matter of Whitney.*)

It will be apparent that the opposing results of these decisions involves the seeker after a rule of conduct in a hopeless maze of contradictory rulings, most of which are, to a certain degree, indirect defiance of the essential verities of the situation, and subversive of the basic principles of trusts as elsewhere universally established.

In a bond secured by mortgage, the holder possesses a dual obligation of the mortgagor, namely, for the payment of a specified principal sum at a time or times set forth therein, and to a certain rate of interest on such principal sum, payable on stipulated dates. The mortgaged property is equally security for both obligations. When the holder is a trustee, the equitable owner of the former obligation is the remainderman, and of the latter, the income beneficiary. When default occurs for a specified period in the payment of interest, both obligations become immediately payable to the trustee and the mortgaged property is equally answerable for both. If, in such a case, the entire security is taken over in satisfaction of the dual obligation, the purchase price of the property thus received consists of the unpaid principal plus the unpaid interest, and thereafter the asset purchased by the extinguishment of the money claims becomes the equitable property of the two persons whose money claims were extinguished by its acquisition, their relative ownerships being in precise proportions to their contributions to the cost of acquisition. Thus if there is a mortgage principal of $8,000, and, at the time the property is taken over, there is $1,000 unpaid interest, and these obligations are extinguished by reason of the transfer of the property in lieu thereof, the equitable ownership of the remainderman in the property is eight-ninths of the total and that of the income beneficiary one-ninth. If, therefore, the property were immediately sold, without the necessity for any additional expenditure thereon, the proceeds

should, and by every reasonable rule would, be divided eight-ninths to capital and one-ninth to income. Such a case is rare though by no means unprecedented.

The next step occurs where the expenditure of new money is required for the purpose of acquiring the property, as for foreclosure expenses and the solution of existing liens. This money may conceivably come from any one of three sources, namely, from other principal funds in the hands of the trustees, from undistributed income which they may happen to hold, or from borrowings from an independent third party. No matter to which source the necessities of the case may compel the trustees to resort, the principles applicable to the use of the fund should be the same. If neither principal nor income funds are available to the trustees, they will be obliged to have recourse to an outside lender, who will not only demand the return of his loan in full, but will require the payment of interest at the prevailing rate thereon during the period of employment. If infra-trust funds are available and are used, the same principles should be applied. The amount of the salvage expense becomes a lien upon the entire asset, namely, the property taken over, which lien is superior to the interests in the property of the remainderman and income beneficiary and should be first repaid, with interest, upon ultimate liquidation, before any sum is payable either to principal or income. Continuing the example hereinbefore supposed, with unpaid principal of $8,000, and unpaid interest of $1,000, and an expense for foreclosure and prior liens of $1,000, if the property were sold immediately, the sum received on liquidation should be used, first to pay the expense of $1,000, plus interest thereon, for the period of its employment. The balance would be divisible to principal and income accounts, in the proportions of eight-ninths and one-ninth respectively. Of course, if the expense money were borrowed from an outside source, the interest thereon would be payable to the lender. Similarly, if income accumulations were used, it should be paid to the income beneficiary. If principal were employed, however, the income beneficiary, if entitled to all of the income of the trust, should receive it in the same manner and for the same reason as if it were invested in an entirely extraneous transaction.

The next question, in the solution of which some of the previous adjudications have departed most seriously from logic, in the opinion of this court, concerns the rights of the income beneficiary to a sum in lieu of income on ultimate liquidation, for the period between the acquisition of the property in satisfaction of the mortgage, and its ultimate sale, where no income is actually received. In *Meldon* v. *Devlin* this substituted return was com-

puted at six per cent. The vice of this method of adjustment becomes apparent by use of a concrete example. Let it be supposed, as in the previous examples, that at the time the property is taken over the unpaid principal is $8,000 and the unpaid interest $1,000, so that equitable ownership of the property is vested eight-ninths in the remainderman and one-ninth in the income beneficiary. Excluding questions of costs of foreclosure, etc., and carrying expenses or income receipts, which have no relevance to the present problem, the rights of the respective parties upon immediate sale for $6,000, would be, remainderman $5,333.33 and income beneficiary $666.67. In other words the vested rights of the remaindermen consist of eight-ninths of " X " dollars, the " X " being the total value of the property as determined by a sale. If it be postulated, however, that instead of an immediate sale of the property, disposal cannot be accomplished until the expiration of twenty years, as in *Matter of Myers*, and still excluding any questions of income or carrying charges, the application of the rule of *Meldon* v. *Devlin* increases the income investment from $1,000 to $10,600, with the result that income becomes entitled to 10600/-18600ths of the sale price and principal to only 8000/18600ths. If, again, the property is sold for $6,000, principal will receive only $2,580.64, instead of $5,333.33 due it on immediate sale, while income will be credited with $3,419.36 instead of $666.67. In other words, the income beneficiary is given $2,752.59 at the expense of the remainderman, and this in spite of the fundamental fact that all which was given the income beneficiary by the will was the usufruct of the fund, and that the primary principle elsewhere universally applied is that there shall never be any trenching upon the rights of the remainderman except where a corresponding benefit is demonstrable.

The anomaly introduced by *Meldon* v. *Devlin* was obviously due to two causes, *first*, to a flat misreading of *Matter of Moore* (54 L. J. Ch. 432), upon which it relies for authority, and which, as noted, held flatly that in the absence of income receipts, the income beneficiary could receive nothing in addition to his *pro rata* at the time of the foreclosure of the ultimate liquidation sum, and, *second*, to the indulgence of this fiction that in spite of the fact that the original investment in the bond and mortgage had ceased to exist either by its foreclosure or payment in satisfaction for a deed for the premises, the income beneficiary was still entitled to interest thereon. The right to receive interest either legally or equitably implies the indispensable correlative of a person obligated to pay it, but in the situation under discussion, there is no such obligor. It is not the original mortgagor, since he has been per-

manently discharged from any connection with the matter. On all primary rules it cannot be the remainderman or his property. The result of its allowance is, therefore, precisely what Judge PEARSON refused to do in *Matter of Moore,* namely, to " take it out of other people's money to pay him."

It would seem that the same consideration may have troubled Surrogate SILKMAN in *Matter of Marshall,* since he indulges the further fiction that because the trustees were not authorized to invest in real property by the terms of the will, they did not do so by receiving the real estate in satisfaction for the bond and mortgage. This is surely fiction run riot. The trustees took title to the realty in return for the extinguishment or surrender of an asset of the estate, namely, the bond and mortgage. This was inevitably an investment albeit unquestionably an undesired and involuntary one which the trustee mentally determined to liquidate at the earliest possible moment. His mental reservation, however, could not alter the nature of his act.

Furthermore, the statement that under the existing circumstances the trustee, in view of the limitations of the will, was not justified in investing in real property, is plainly erroneous. His primary obligation was to conserve the assets of the estate and so long as he diligently and prudently adopted the only available course open to him to this end, the law would uphold him in his dealings. That the limitations of the will respecting investments are not an infallible guide to the conduct of trustees has been determined on innumerable occasions. (See *e. g.,* FOLEY, S., in *Matter of Pulitzer,* 139 Misc. 575; affd., 237 App. Div. 808; *Matter of Wander,* 141 Misc. 584.)

The *cestui que trust* under the present will, which is typical of the usual case, is given merely " the income " of the trust estate " as and when the same accrues." No power of invasion of principal is expressed, and none can be implied. To what then is she entitled? To just what the will gave her; no more and no less. The trustees, by force of circumstances, have rightfully made an investment in real property. Though, on acquisition, they intended to dispose of it as soon as possible, it was still an investment of principal so long as it was held, and during this period of retention, the income beneficiary should be entitled to receive therefrom just what the testator gave her, namely, " the income * * * as and when the same accrues." In this respect, the situation is no different from that which exists in respect to real property left by the testator and carried into the trust corpus in that form. She should be entitled to receive the net income after the payment of the usual carrying charges, which naturally include

the payment of interest on all incumbrances among which would be numbered the salvage expenses, if any, incident to taking over the property. There is nothing esoteric about such a principle or its operation. The usual rules would be applicable as to the items of expenditure which would be deducted from the gross returns from the property for the purpose of determining the net income to which the *cestui que trust* is entitled (See *Matter of Shepard*, 136 Misc. 218, and authorities cited), although it would be within the reasonable discretion of the trustees as to the time when income payments of this variety were to be payable, and if reasonably prompt complete liquidation of the entire matter appears probable, their retention of all net income until such time would probably not, in the usual case, amount to an abuse thereof.

Such a rule, if adopted, would work even-handed justice to all. An income beneficiary under a mortgage investment should not be entitled to preferred treatment over the *cestui* in a trust the funds of which have been placed in any other variety of security. If the will authorized investment in stocks, as in cases like the present, the law condones investment in real property, and he would be entitled to nothing if nothing were received from the security, even though the corporation which issued it went through a reorganization under section 77B of the Bankruptcy Act (U. S. Code, tit. 11, § 207) and new securities were substituted for those initially held.

The injection into the consideration of the problem of the so-called salvage principles based on *Meldon* v. *Devlin* is strongly reminiscent of certain pastimes of childhood and adolescence. If, in the usual case, a trustee sells an item of the corpus and reinvests the proceeds, and the new investment proves unproductive, the remainderman is not obliged to suffer a substantial potential loss of his birthright in favor of the income beneficiary. Under this rule, however, if the substitution is for a particular parcel of real property, and the trustee makes a mental reservation to the effect that the operation is to be one " for salvage," he does. Who is to determine whether or not the operation was one for profit, as has so frequently occurred during the past six years, or is actually for salvage? Is a series of rules to be evolved similar to those respecting the time and mode of raising the arm in order to constitute a " fair catch " in intercollegiate football? Here indeed is an additional source for profitless litigation and additional fiction. Further, the rate of hypothetical but unreceived and unreceivable income to the income beneficiary is a subject on which no two authorities have ever been able to agree. The propounded formula is " the average rate of return during the period." No average

rate of return is possible of computation unless the nature of the investment upon which the return is based be postulated. Prior to 1929, when there was a market for second mortgages, the rate reserved therein was customarily six per cent, but it is a fact familiar to all, that a bonus of from ten to thirty per cent of the face of the mortgage was frequently exacted for a three-year mortgage. In other words, the average rate of return for such an investment in good times was in the vicinity of sixteen per cent per annum. During the period here under consideration, second mortgage money was not procurable at any price. Certainly the land securing the second mortgage, subject to the first mortgage, could not be worth as much as the same security plus the personal obligation of the mortgagor. It follows, therefore, that the determination of an average rate of return on such an investment is either wholly impossible, or, if computed with any remote approximation of correctness, would be wholly confiscatory. The application of the rate procurable on first class security introduces another fiction into the situation already sadly overburdened in this regard.

The continued application of the entire rule is merely a perpetuation of a situation of artificiality and uncertainty. The only conceivable remedy lies in clarification on all points by a final determination in the Court of Appeals. This has been accomplished in certain aspects in its latest decision in *Matter of Chapal*, to which reference was heretofore made. The opinion was written by Judge LOUGHRAN, with the concurrence of all except Judge O'BRIEN, not sitting. Its result is to reverse the determination of the Appellate Division (245 App. Div. 818) and to modify the result of the surrogate in the case. The relevant facts are meagrely disclosed but it appears that certain mortgages were foreclosed by the trustees, with the acquisition of real estate which was thereafter productive only in part. The surrogate, in granting the prayer of the trustees for instructions, directed that upon sale of any particular parcel, apportionment of the proceeds of the sale should be made between principal and income. This was reversed by the Appellate Division which directed that all proceeds should be added to principal.

The opinion of the Court of Appeals, in so far as presently pertinent, reads as follows:

" We are in accord with the courts below in their treatment as separate units of properties acquired by the trustees through foreclosure. This method conforms to the procedure followed in *Furniss* v. *Cruikshank* (230 N. Y. 495). [See the statement made in the opinion at p. 509.] Practical good sense dictates its adoption here. No two parcels taken over by the trustees will be brought in on

the same basis.   Ordinary experience does not justify the expectation that any two can be sold under similar conditions.

" The order of the Appellate Division follows the decree of the Surrogate as to the proper source of carrying charges pending a sale.   A difference of view in respect of that subject is reflected only in the opinion of the higher court.   Its dictum may be disregarded.   If each parcel is to be managed separately, a deficit of carrying charges must be advanced out of principal.

" It was decreed by the Surrogate that the proceeds of a sale should be allocated between principal and income.   It was ordered by the Appellate Division that the sale proceeds should be returned to the capital account in every instance.   Here, we think, the Surrogate was right and that the modification of his decree by the Appellate Division was unwarranted.

" No rule of apportionment has been stated.   Doubtless the Surrogate thought it expedient to await the event of a liquidation with loss to both principal and income, a resulting profit not having been supposed.   His opinion tells us, however, that he may make an allocation in accordance with the rule applied by us in *Furniss* v. *Cruikshank* (*supra*), and this state of the record persuades us to suggest that it is unnecessary to rely upon the analogy of that and like cases.   There the court was dealing with property that had been unproductive in the ownership of the testator.   In the opinion it was said: ' Authorities are of little help.   The construction of every will depends upon the varying language used and the varying conditions surrounding the testator ' (p. 505).   After discussion of the background against which the will was to be interpreted, it was held that an equitable conversion was effected as of one year after the trust was set up.   We have now another problem — that of the liquidation of real estate acquired of necessity because of default on a mortgage investment.

" In such an investment situation what is involved is the salvage of a security.   The security it is to be remembered is a security not for principal alone but for income as well.   On a sale, therefore, the proceeds should be used first to pay the expenses of the sale and the foreclosure costs and next to reimburse the capital account for any advances of capital for carrying charges not theretofore reimbursed out of income from the property.   Then the balance is to be apportioned between principal and income in the proportion fixed by the respective amounts thereof represented by the net sale proceeds.   In the capital account will be the original mortgage investment.   In the income account will be unpaid interest accrued to the date of sale upon the original capital.   The ratio established by these respective totals determines the respective

interests in the net proceeds of a sale. Since that matter has not been argued before us, we do not fix the rate at which interest is to be computed.

" This method of apportionment for cases of the present type is not novel. Its essential principle was recognized and applied in *Meldon* v. *Devlin* (31 App. Div. 146; 167 N. Y. 573). (See, also, *Matter of Marshall*, 43 Misc. Rep. 238.) Of course, that method may not be used when a will or trust indenture prescribes a valid contrary course. That is not the case here."

Whereas many of the intimations of the opinion are frankly dicta, they are not on this account to be disregarded by a court of first impression under penalty of assuming an attitude of contumaciousness. Listing all statements, both adjudications and dicta on a parity, the following guides to conduct are laid down:

1. Each property acquired by foreclosure or deed is to be treated as a separate unit, and computations made separately regarding it.

2. A deficit of carrying charges after acquisition is to be advanced out of principal.

3. On final liquidation, the proceeds are to be apportioned between principal and income.

4. In such allocation, the rule of *Furniss* v. *Cruikshank* (230 N. Y. 495) is not applicable.

5. The proceeds of liquidation are to be used in the following order:

a. To pay the expenses of sale and foreclosure costs.

b. To reimburse capital account for any advances for carrying charges not already paid out of the income of the property.

c. To apportion the balance between capital and income accounts in the proportion which the original mortgage investment bears to the " unpaid interest accrued to the date of sale upon the original capital," in accordance with the principles recognized in *Meldon* v. *Devlin* and *Matter of Marshall*.

d. Determination as to the rate of interest to be employed in calculating the income investment is expressly reserved from determination.

6. The apportionment should be made " on a sale," which, presumably, is to be interpreted as meaning " on final liquidation."

In view of the binding nature of this pronouncement on this court, it follows that, in so far as the questions at issue are covered by these points, they supply the inevitable rules for decision of the issues. The following questions are, however, not answered:

*First.* The rate of interest to be allowed the income beneficiary from the " date of default " to the date of sale.

*Second.* Whether the income beneficiary is entitled to any return on the additional principal investment employed in the salvage operation.

*Third.* Whether the excess of income from the foreclosed property should be held in suspense until the date when such property is finally liquidated.

The first is the only problem presenting any especial difficulty. In *Matter of Marshall* the rate allowed was the " current rate for the period," presumably on well-secured legal investments. *Meldon* v. *Devlin* allowed six per cent, although the then-defunct bond called for seven per cent. No reason for this was assigned. In *Matter of Myers* the " current rate " was approved as the criterion, although a considerably smaller sum appears to have been allowed. That there can have been no " current rate " of return for a security of the variety here under discussion seems obvious for the reasons heretofore advanced. It would furthermore seem to be piling absurdity on the ridiculous to allow as the " current rate " only the return which a prime investment would command, particularly since, in the usual case, it is to be promptly reduced to an approximation of the vanishing point in the process of apportionment. The whole theory of the allowance of interest, as such, at all, is that the vanished obligation of the bond still continues in existence until the date of the final liquidation. If this theory is to be considered valid in any connection, it should apply throughout, and the rate reserved therein should govern.

On the second special issue of the case, the court believes that invidious distinction should not be made depending on whether or not the trust estate had free capital available to pay the costs of foreclosure. If it did not, and borrowing from an outside source were necessary, capital so procured would receive an interest return which would be properly chargeable as an additional salvage expense. If the same method were not adopted where trust capital is used, the income beneficiary would be deprived of a part of his gift, namely, the use of so much of the capital as is thus employed, for the partial benefit of the remainderman. It follows that the average daily capital employed in the salvage operation should be computed and a reasonable return allowed thereon as an added salvage cost. Since the security for such advances would usually be excellent, the return should approximate the current legal investment rate for the period, which, in the case at bar, the court determines to have been four per cent.

Finally, since, under the rules of the Court of Appeals, the salvage expenses are a first lien on all proceeds, the profits of operation

of the property should be used, as received, to repay the moneys used in the taking over of the property.

The application of the rules of *Matter of Chapal*, and the three additional ones stated results in the following determinations in the case at bar:

K-11. The computations of the bank are approved.

K-27. No apportionment will be made until the bonds are received and liquidated, whereupon the computations will be made on the same basis as in K-11.

K-28. If the new first mortgage is of the same amount as the one formerly existing, the payments in addition to the new second mortgage may be considered merely as amortization payments reducing it to the new figure, and the new second mortgage may be continued in principal account and apportionment made of the sums received, when the H. O. L. C. bonds are liquidated. In this event, the principal investment to be used in the allocation computation would amount to $766.58. If, however, the new first mortgage differs from the old, the entire matter must be held in suspense until complete liquidation is effected.

K-29. The net proceeds of $225 are to be apportioned on the basis of 40/1040ths to income and 1000/1040ths to principal.

K-45. On ordinary principles, since this property came from the testator, the loss in operation of $253.12 is chargeable to income and the inventory value of $3,250 is chargeable to principal.

K-46 and K-2. This property is to be continued in suspense until final liquidation, the interests of income and principal being ultimately calculable on the basis indicated in respect to K-11 subject to a lien for salvage expenses of $1,565.86, which sum may be reduced from time to time by profits made from the operation of the property.

K-47 and K-14. The same result is to be adopted as in K-46 except that the operating loss of $41.81 is, in the interim, to be advanced from principal as an additional salvage expense, to be repaid prior to any apportionment of proceeds on final liquidation.

K-48 and K-15, K-49 and K-18. The computations of the bank are accepted in their entirety.

K-50 and K-21, K-51 and K-30. The same considerations apply in connection with these properties as are set forth respecting K-46.

Enter decree on notice.